**Supreme Court**

No. 2011-164-C.A.

(W1/10-197A)

State                    :

   v.                    :

Luigi Ricci.             :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

| State | : |
| :--- | :--- |
| v. | : |
| Luigi Ricci. | : |

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Indeglia, for the Court.**   The defendant, Luigi Ricci (Ricci or defendant), appeals from a Superior Court judgment of conviction.  On appeal, he contends that the trial justice committed reversible error in (1) failing to adequately instruct the jury on how to assess the credibility of the state's witnesses; (2) failing to instruct the jury that a history of drug abuse may weaken the credibility of a testifying witness; and (3) denying his motion for a new trial. After reviewing the record and considering the parties' written submissions and oral arguments, we discern no error on the part of the trial justice and affirm the judgment of the Superior Court.

**I**

**Facts and Travel**

On March 26, 2010, Ricci was charged by indictment with one count of burglary in violation of G.L. 1956 § 11-8-1 (count 1), one count of robbery in the first degree in violation of G.L. 1956 § 11-39-1(a)(3) (count 2), and one count of assault on a person over the age of sixty in

violation of G.L. 1956 § 11-5-10 (count 3),[1] all stemming from a confrontation that allegedly occurred on December 18, 2009, at the North Kingstown home of the complainant, Francis Quinn (complainant or Quinn). The Attorney General also presented Ricci as a habitual offender under G.L. 1956 § 12-19-21.[2]

On September 30, 2010, a Washington County Superior Court jury found Ricci guilty on all three counts. Thereafter, the trial justice sentenced him to thirty years in prison, with twenty years to serve, ten years suspended, and ten years probation on count 1; thirty years, with twenty years to serve, ten years suspended, and ten years probation on count 2; and ten years to serve on count 3. The sentences imposed were to run concurrently. Additionally, at sentencing, the trial justice declared Ricci to be a habitual offender, and accordingly imposed a consecutive sentence of fifteen years, with ten years to serve before becoming eligible for parole.

During the trial, which commenced on September 28, 2010, the state called five witnesses: Quinn; Walter French, a former friend of Ricci's; Britny Loiselle, a prostitute who visited Quinn's home with Ricci two evenings prior to the incident in question; and two members of the North Kingstown Police Department, Det. Tyler Denniston and Sgt. Jason Clark. The witnesses testified to the following relevant facts.

The complainant, Quinn, who was seventy-one years old at the time of trial, had suffered a stroke in 2008 and consequently "couldn't remember a lot of things." He testified that he took prescription medication daily. On the night of December 18, 2009, Quinn was asleep at his

---

[1] On count 3, the original indictment incorrectly charged defendant with violating G.L. 1956 § 11-5-20, rather than § 11-5-10. We pause to note that although the state later filed an "amended indictment" correcting this error in open court, and defense counsel did not object, it is unclear from the record whether defendant himself consented to the "amended indictment" in accordance with Rule 7 of the Superior Court Rules of Criminal Procedure.

[2] It appears from our review of the record that the Attorney General did not present Ricci as a habitual offender either within forty-five days of the arraignment or prior to the date of the first pretrial conference, as required by the statute. However, this issue is not before us on appeal.

home in North Kingstown. He suddenly awoke when an intruder broke into his home and "knocked [him] on the floor and had [him] by the throat." Consistent with what he told police immediately after the incident, Quinn testified that he recognized the voice of the intruder and concluded that it was Ricci. According to Quinn, Ricci's voice was "clear as can be * * * saying 'where's your f---ing money?'"

Quinn's witness statement given to police on the night of the attack did not mention that he actually recognized the intruder other than by his voice. In fact, when asked by police that night if he could describe anything the intruder was wearing, Quinn answered, "No, he had me by the throat." Nevertheless, Quinn did identify Ricci as his attacker when shown a photo array on the night in question at the police station; and, when asked at trial if he was able to actually see the intruder during the incident, Quinn testified: "Yeah."

According to Quinn, during the attack, Ricci exclaimed, "You got tons of money motherf---er, get me the money!" He then "grabbed [Quinn's] wallet from his pants" and stole the contents, which totaled approximately $40. Quinn testified that the entire attack lasted for approximately two minutes before the intruder "booked it" and left. Quinn then dialed 911, but not before he first "put [his] glasses on * * * so [he] could read."[3] As a result of the attack, he sustained injuries to his face and arms, but did not require any medical attention.

Further, Quinn testified that he first became acquainted with Ricci sometime in 2003, when Ricci frequently visited Quinn's neighboring female tenant. Quinn would see him "quite often." After the female tenant moved out, he did not see Ricci again until December 16, 2009, two nights before the crimes at issue. On that night, Ricci arrived at Quinn's home with a female prostitute, later determined to be Britny Loiselle, whom Quinn had never seen before. "[Ricci

---

[3] Quinn testified that he was not wearing glasses at the time of the attack.

-3-

and Loiselle] were banging on the door" and when Quinn opened it, they "walked right in." Ricci asked him for money, which he said was for Loiselle. In exchange for the money, he told Quinn that "you can go to bed with [Loiselle]." While inside Quinn's bedroom, Loiselle offered to have sex with him. Quinn testified that he did not remember having intercourse with her, but that he gave her $20. Before Ricci and Loiselle left his home, Quinn testified that Ricci gave him a piece of paper with his name and number on it, telling Quinn to "call me at this number any time you need anything."[4]

Loiselle was subpoenaed and testified at trial that she had indeed arrived at Quinn's home with Ricci "late at night" on December 16, 2009. Although Quinn testified that he could not remember whether he had intercourse with Loiselle that night, she testified that she had in fact "exchanged sex for money" with him. Loiselle further testified that it was she, not Ricci, who wrote Ricci's name on the paper given to Quinn so that he could "contact us." She did not recall, however, if she had written Ricci's phone number on that piece of paper. Loiselle further testified that she and Ricci went back to Quinn's home one or two nights later to "get more money" and again knocked on his door. However, when Quinn did not answer the door, they left. Loiselle testified that she never returned to Quinn's home after that night.[5]

She further testified that "sometime around Christmas" of 2009, she had a conversation with Ricci. He told her to "keep [her] f---ing mouth shut because he left a piece of paper with [her] name up at [Quinn's] house saying that [she] had done something with him." Ricci then told her that he had gone to Quinn's home and accused him of hurting Loiselle and told Quinn that "he was going to call the cops if [Quinn] didn't give him money." Loiselle further testified

---

[4] This paper, admitted as a trial exhibit, was later retrieved by the North Kingstown Police Department on the night in question after police responded to Quinn's 911 call. The police confirmed that the phone number belonged to Ricci.

[5] It is undisputed that Loiselle was not involved with the crimes at issue in this case.

that she did not know about the crimes at issue in this case until she later saw Ricci "on the news."

Loiselle admitted that, at the time of trial, she was a recovering drug addict and that she had previously been addicted to crack cocaine. However, on cross-examination by defense counsel, she testified that she was not presently under the influence of any drugs and that she did not have any difficulties answering questions.

Walter French testified for the state that he had known Ricci for "[p]robably over ten" years. One night in December 2009, Ricci came to his house appearing "a little shaken up" and "a little nervous." Ricci told him that "he had just heard that his picture was on 'Rhode Island's Most Wanted' on the TV." Ricci then asked French if he could stay at his house for the night. French allowed Ricci to sleep in a car.

On direct examination, French repeatedly denied that Ricci ever mentioned anything to him about the crimes at issue. When specifically asked by the prosecutor if he "remember[ed] telling us that [Ricci] * * * told [him] he robbed the guy in North Kingstown," French responded: "No."

Following a brief court recess, French resumed his testimony. Treating French as a hostile witness, the prosecutor again asked French if Ricci had told him: (1) that he broke into Quinn's home; (2) that he covered his face so that Quinn would be unable to see him; and (3) that he was nervous because he spoke to Quinn during the robbery and thought that Quinn might have recognized his voice. Recanting his earlier testimony, French responded: "Yes," to each query.

Counsel for defendant cross-examined French, inquiring whether, during the court recess, he "ha[d] the opportunity to confer with the prosecution or members of law enforcement."

French responded: "Yes." He also testified that, during the court recess, the prosecutor told him that he "could be committing perjury by lying." French then testified that he was "involved with probation" and that he "d[idn't] want to go back to jail."

In an effort to expose possible bias, defense counsel then asked French about a series of "love" letters he had sent to Ricci's girlfriend, Cynthia Heller, which sought to persuade her to leave Ricci for him. In the letters, he expressed that he wanted to hurt Ricci "like he [had] hurt [him]." He also wrote that Ricci is "going to be down," meaning incarcerated, for "whatever he's got hanging." He further testified on cross-examination that he remained "angry with [Ricci]" because "he took something from me that can't be replaced."

At trial, French acknowledged his lengthy criminal record. During cross-examination, he further testified that he was a recovering drug addict. He testified that, among other things, he had smoked crack cocaine and "injected" powdered cocaine. However, he testified that his use of these drugs did not affect his memory.

Detective Tyler Denniston of the North Kingstown Police Department testified that he responded to Quinn's 911 call. When he arrived at Quinn's home, Quinn explained that Ricci "was on top of him, choking him when he woke up, and that they were in a struggle and that the struggle went down to the floor, at which point [Ricci] told him he wanted money and [then] he took $40 from a wallet and left." Detective Denniston determined that the attacker had entered through an unlocked window in the back spare bedroom, and he noted that Quinn had "scratch marks" and "abrasions."

Detective Denniston testified that he then transported Quinn to the North Kingstown police station, where he took a formal witness statement in which Quinn recounted the attack and again stated that Ricci was the attacker. He testified that Quinn did not have any trouble

remembering or articulating what had happened that night when giving the witness statement, although Quinn did mention to him that he previously "had suffered from a stroke."

At the station, Det. Denniston provided Quinn with a six-photo array and issued him a standard written instruction that the photos might or might not include a picture of the person Quinn had named as his attacker. After reviewing the photos, Quinn "immediately recognized" Ricci and identified him as the man who had attacked him.[6]

Thereafter, a warrant was issued for Ricci's arrest. According to Det. Denniston, once arrested and apprised of his rights, Ricci stated that he "had not seen Quinn in a couple of years." At the time of the arrest, Ricci was in possession of Loiselle's birth certificate, as well as numerous documents belonging to others.[7]

Sergeant Jason Clark also testified that he arrived at Quinn's home later that night to process the crime scene. Sergeant Clark also determined that the attacker had gained entry to Quinn's home through the unlocked window. He testified that plastic insulation that had covered the window was damaged from the outside going inward. He noted that dust had been freshly disturbed on the window frame, although no identifying evidence was developed from any fingerprints. He further testified that he found a blood droplet in the hallway between the front door and Quinn's bedroom. However, the blood droplet was never processed for any identification.

Following the state's case in chief, defense counsel moved for a judgment of acquittal pursuant to Rule 29(a) of the Superior Court Rules of Criminal Procedure, which the trial justice denied. The defense then rested.

---

[6] At trial, Quinn pointed to Ricci when asked if he saw his attacker in the courtroom.

[7] It is unclear from the record why or how Ricci was in possession of these items. Loiselle testified that she had never given Ricci her birth certificate.

Prior to the close of the case, defense counsel filed a written request for jury instructions. Relevant to this appeal, defense counsel requested that the jury instructions include specific language instructing the jury to "[c]onsider the witness' ability to observe the matters as to which he or she has testified and consider whether he or she impresses you as having an accurate memory or recollection of these matters" (Instruction 3). As discussed below, the trial justice did not include this exact language in his final instructions to the jury.

Counsel for defendant also submitted an additional request for jury instructions pertaining specifically to the testimony of Walter French. In this supplemental request, defense counsel urged the trial justice to instruct the jury that "[t]he testimony of a drug abuser must be examined and weighed by the jury with greater care that [sic] the testimony of a witness who does not use drugs. The jury must determine whether the testimony of the drug abuser has been affected by drug use or the need for drugs. * * * Walter French may be considered to be an abuser of drugs, and I instruct you to weigh his testimony more carefully than you would the testimony of a witness who does not abuse drugs" (the Drug-Use Instruction).

The trial justice refused to give the Drug-Use Instruction to the jury, stating that there was "absolutely no evidence before this jury that would suggest that * * * a drug addict is less credible." The trial justice also noted that defendant had offered no expert testimony on this issue. Moreover, the trial justice pointed out that no Rhode Island case law had been cited requiring any jury instruction relative to drug users.

The trial justice then proceeded with his instructions to the jury. Just prior to the close of his instructions, and outside the presence of the jury, he sought from counsel "objections to the charge, suggested additions, [and] corrections." Defense counsel specifically objected to the trial justice's omission of Instruction 3, as well as to the trial justice's refusal to give the Drug-Use

Instruction. The trial justice noted counsel's objections, but stated that "the subject matters of the requested charge not included [were] fairly covered by other instructions [he] gave to the jury."

The jury returned guilty verdicts on all three counts. Ricci timely filed a motion for a new trial, which the trial justice denied. That decision was memorialized in a written order entered on December 15, 2010. Thereafter, Ricci timely appealed to this Court. On appeal, defendant challenges: (1) the failure of the trial justice to instruct the jury with respect to his proposed jury instructions, Instruction 3 and the Drug-Use Instruction; and (2) the trial justice's denial of the new trial motion. We address each issue in turn.

## II

## Analysis

## A

## Jury Instructions

## 1

## Standard of Review

This Court engages in a de novo review with respect to jury instructions. State v. Cipriano, 21 A.3d 408, 423 (R.I. 2011) (citing State v. Ros, 973 A.2d 1148, 1166 (R.I. 2009)). It is well settled that "[t]he trial justice need not use particular words in the instruction, but must 'correctly state[ ] the applicable law.'" Id. (quoting State v. Imbruglia, 913 A.2d 1022, 1030 (R.I. 2007)). Accordingly, we review "[jury] instructions in their entirety to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them." Id. (quoting Ros, 973 A.2d at 1166). This Court has consistently held that when the "requested charge is fairly covered in the general charge," the "trial justice's refusal to grant a request for jury

instruction is not reversible error." State v. Price, 706 A.2d 929, 934 (R.I. 1998) (quoting Taylor v. Allis Chalmers Corp., 610 A.2d 108, 109 (R.I. 1992)). Furthermore, "[a]n erroneous charge warrants reversal only if it can be shown that the jury 'could have been misled' to the resultant prejudice of the complaining party." State v. Sivo, 925 A.2d 901, 913 (R.I. 2007) (quoting Saber v. Dan Angelone Chevrolet, Inc., 811 A.2d 644, 653 (R.I. 2002)).

**2**

**Discussion**

Both at the start of the trial and again at its close, the trial justice instructed the jury as to its role in assessing witness credibility and in weighing the evidence provided by each witness. After carefully reviewing the instructions given, we believe that the trial justice did not err in declining to issue Instruction 3 and the Drug-Use Instruction. We will discuss each in turn.

**i**

**Defendant's Proposed Instruction 3**

We hold that the trial justice did not err in refusing to explicitly instruct the jury that, in assessing credibility, it could consider a witness's ability to observe and recall.

Notably, in his instructions to the jury, the trial justice suggested that the jurors use the "same tests that [they] use every day" in assessing the credibility of the witnesses. "[W]ithout limiting the generality" of that, he then proposed numerous factors for the jury to consider. (Emphasis added.) These factors included the intelligence, age, appearance, conduct, demeanor, frankness, and candor of the witness, as well as whether the witness seemed interested in the outcome. These factors also included whether the witness was biased or would have had a motive to be truthful or untruthful.

The trial justice instructed the jury to "consider * * * any consistencies or inconsistencies between what a witness testified to at trial and what that witness may have said at an earlier time." Moreover, he further instructed the jury to consider the probability or improbability of the truth of the witnesses' testimony and to consider the presence of corroborating or contradictory evidence. Additionally, and of import, he instructed the jury to "consider the ability of the witness to relate, the memory of the witness," and whether the witness was "in a position to see or hear or sense that which she or he claims she heard."

We are satisfied that the instructions given adequately informed the jurors of their role in assessing witness credibility. Furthermore, it is well settled that "[c]ounsel rather than the court are the appropriate agents to argue to the jury concerning the specific credibility or lack thereof of a particular witness." State v. Barros, 24 A.3d 1158, 1168 (R.I. 2011) (quoting State v. Fenner, 503 A.2d 518, 525 (R.I. 1986)). Counsel for defendant had a full opportunity to cross-examine each of the testifying witnesses and to argue to the jury at closing about any deficiencies in credibility.

Although we find no fault with proposed Instruction 3, we repeat that the trial justice "need not use particular words" in instructing the jury. Cipriano, 21 A.3d at 423 (quoting Imbruglia, 913 A.2d at 1030). We agree with the trial justice that his instruction fairly covered the subject matter of Instruction 3, especially since he instructed the jury to consider each witness's memory and ability to "see or hear or sense" when assessing his or her credibility.

**ii**

**Defendant's Proposed Drug-Use Instruction**

We further hold that the trial justice did not commit reversible error in refusing to instruct the jury in accordance with defendant's proposed Drug-Use Instruction. We have long held

-11-

that a trial justice is not "required in every instance to instruct the fact-finder on the use of evidence relating to the effect of drug consumption on credibility once that evidence has been properly placed before the jury." State v. Barnes, 559 A.2d 136, 140 (R.I. 1989).

Here, we note that defense counsel had a full opportunity to confront and cross-examine both Loiselle and French with respect to their drug use. In an effort to undercut their credibility, counsel for defendant raised the prior drug use and drug addictions of these witnesses during cross-examination. Both testified that they had previously used drugs and that they were recovering drug addicts. However, each further testified on cross-examination that any prior drug use did not affect his or her memory or his or her ability to remember the facts in question. Additionally, during closing argument, defense counsel reminded the jury that French "illegally bought [drugs] on the street."

We remain fully convinced that it is the very purpose of both direct and cross-examination to provide the jury with a "meaningful basis upon which credibility assessments can be made." Barros, 24 A.3d at 1168. Indeed, it is axiomatic that the fundamental role of counsel in our adversarial system of justice is to utilize these potent tools to convince the jury of the respective party's contentions at trial. The jury was fully apprised of the fact that Loiselle and French were both acknowledged drug addicts, especially on cross-examination by defense counsel. This Court will not speculate about whether the jury found defense counsel's cross-examinations persuasive in assessing witness credibility. We further note that "[i]t is not the function of a trial justice to act as [an] advocate for either the prosecution or the defense." Id. at 1167 (quoting Fenner, 503 A.2d at 525).

Here, the jury instructions were broad. The jury was instructed to "determine for [them]selves the reliability or unreliability of [the witnesses'] statements." Indeed, the trial

justice instructed the jurors to use the "same tests that [they] use every day * * * in a variety of contexts" when assessing witness credibility. As such, the jury was free to decide, in reflecting on the totality of each witness's testimony, whether to weigh drug use as a factor in assessing credibility.

Moreover, the trial justice noted that no evidence was introduced to suggest that the testimony of a drug addict was somehow less credible than the testimony of someone who was not a drug addict.[8] Furthermore, it is well settled that "a trial justice should avoid reciting instructions that might be construed as commentary on the quality or credibility of particular evidence." State v. Hadrick, 523 A.2d 441, 444 (R.I. 1987). In that regard, "we have repeatedly stressed that a trial justice is obligated to avoid expressing any opinion about the weight of the evidence or the credibility of witnesses as long as the case is before the jury." State v. Farlett, 490 A.2d 52, 56 (R.I. 1985).

On the facts presented, we believe that the Drug-Use Instruction would have operated as an improper commentary on each witness's credibility, thereby undermining the very vital role of the jury. Therefore, we hold that the trial justice did not err in refusing to issue this instruction.

**B**

**Denial of Motion for a New Trial**

**1**

**Standard of Review**

This Court accords great weight to a trial justice's ruling on a motion for a new trial and will leave that ruling undisturbed if he or she has "'articulated an adequate rationale for denying'

---

[8] This Court expresses no opinion as to the propriety or admissibility of such evidence in future cases.

the motion * * *, and has not misconceived or overlooked material evidence * * *." State v. Staffier, 21 A.3d 287, 291 (R.I. 2011) (quoting State v. Rodriguez, 996 A.2d 145, 149 (R.I. 2010)).

It is well settled that "[w]hen ruling on a motion for a new trial, the trial justice acts as a thirteenth juror, exercising 'independent judgment on the credibility of witnesses and on the weight of the evidence.'" State v. Heredia, 10 A.3d 443, 446 (R.I. 2010) (quoting Imbruglia, 913 A.2d at 1028). In carrying out this task, "the trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." Staffier, 21 A.3d at 290 (quoting Heredia, 10 A.3d at 446).

Accordingly, "[i]f the trial justice agrees with the jury's verdict, the inquiry is complete and the motion for a new trial should be denied." Staffier, 21 A.3d at 290 (citing State v. Morales, 895 A.2d 114, 121 (R.I. 2006)). However, if the trial justice disagrees with the jury's verdict, he or she then must conduct a subsequent fourth step to "determine whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice. If the verdict meets this standard, then a new trial may be granted." Id. at 290-91 (quoting State v. Guerra, 12 A.3d 759, 765–66 (R.I. 2011)).

**2**

**Discussion**

On appeal, Ricci presses the arguments he advanced below in support of his motion for a new trial: that the verdict was "contrary to the weight of the evidence" and that the "evidence adduced at trial was insufficient for the jury, as fact finder, to conclude that [Ricci was] guilty beyond a reasonable doubt." He maintains that he was "substantially prejudiced and deprived of

-14-

a fair trial because the jury, as fact finder, misconstrued the evidence and erred in applying the law to the facts of this case in finding the defendant guilty."[9]

Ricci argues that the trial justice overlooked and misconceived material evidence, especially with respect to the inconsistencies in Quinn's testimony. In the trial justice's written order denying the motion for a new trial, he stated that Quinn "recognized the burglar as the [d]efendant by his voice and sight in the dim light." (Emphasis added.) Ricci points out that the witness statement given by Quinn to the police on the night of the attack did not mention that he had recognized Ricci by sight. Rather, Quinn had told police that he recognized Ricci's voice.

However, Quinn did testify at trial that a ceiling light in the hall lit up his room and that he saw Ricci during the attack. Moreover, on that night, Quinn quickly identified Ricci in a photo array, concluding that Ricci was his attacker. Further, at trial, Quinn pointed to Ricci when asked whether his attacker was present in the courtroom. Notwithstanding this evidence, Ricci avers that, since Quinn testified that he needed to put on his glasses before first dialing 911, it was unlikely that he was actually able to visually identify him during the attack.

Ricci further maintains that Quinn's capacity to recall had been damaged by his stroke, and, as a result, Quinn "mistakenly identified" him as the attacker. Since Ricci had visited

---

[9] We note that, in his motion for a new trial, Ricci averred that the denial of his earlier motion for a judgment of acquittal constituted prejudicial error. This argument, however, has not been raised on appeal. Accordingly, we deem it to be waived. Nonetheless, even if this issue were properly before this Court, "[w]hen faced with a defendant's challenge to the rulings on both motions * * * this Court first conducts a review of the new-trial motion." State v. Pineda, 13 A.3d 623, 640 (R.I. 2011). Accordingly, if we "conclude[ ] that the evidence 'was sufficient to withstand the more stringent review applicable to a motion for a new trial, it follows that the evidence was also sufficient to withstand a motion for a judgment of acquittal.'" State v. Hesford, 900 A.2d 1194, 1200 (R.I. 2006) (quoting State v. Otero, 788 A.2d 469, 475 (R.I. 2002)).

Quinn two nights before the incident, Ricci argues that Quinn confused him with the true attacker. Ricci adds that, while testifying, Quinn repeatedly admitted that he had trouble remembering things.

Ricci also contends that the trial justice misconceived the evidence in finding that French was an "impressive" witness. He points out that French had a lengthy criminal record and was a long-time drug addict. Moreover, on the stand, French (in defendant's words) "switched-up" his testimony. At first, he repeatedly denied that Ricci had ever told him anything about the crimes at issue. It was not until after a brief court recess, during which Ricci suggests the prosecution must have threatened French with a probation violation, that French recanted his prior testimony. After the recess, French suddenly claimed that Ricci nervously had admitted to him that he had broken into Quinn's home and feared that Quinn had recognized his voice. Furthermore, Ricci points out that French admittedly bore animosity toward him, which could explain why French testified against him.

As is required in reviewing a motion for a new trial, the trial justice, in his written decision, assessed the witnesses' testimony and weighed it accordingly. He noted that Quinn's testimony was "credible and reasonably accurate," although he also acknowledged that Quinn had "some memory loss and difficulty articulating certain words and ideas." The trial justice also found French to be a credible witness despite the fact that French "reluctantly" testified about Ricci's admission to him concerning the incident in question. The trial justice noted that French was convincing when he testified that his drug abuse did not adversely affect his memory. Finding that "[o]n this evidence any reasonable jury would have found the [d]efendant guilty beyond a reasonable doubt as would this [c]ourt," the trial justice denied Ricci's motion.

After careful consideration, and mindful of our deferential standard of review, we agree with the trial justice's analysis and hold that he did not err in denying the defendant's motion for a new trial.

## III

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court, to which we remand the record in this case.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**          State v. Luigi Ricci.

**CASE NO:**                No. 2011-164-C.A.
                            (W1/10-197A)

**COURT:**                  Supreme Court

**DATE OPINION FILED:**     November 8, 2012

**JUSTICES:**               Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia JJ.

**WRITTEN BY:**             Associate Justice Gilbert V. Indeglia

**SOURCE OF APPEAL:**       Washington County Superior Court

**JUDGE FROM LOWER COURT**:

                            Associate Justice Edwin J. Gale

**ATTORNEYS ON APPEAL:**

              For State:    Aaron L. Weisman
                              Department of Attorney General

              For Defendant:  Janice M. Weisfeld
                              Office of the Public Defender