**STATE**

v.

**Susan LaPLANTE.**

No. 2007–32–C.A.

Supreme Court of Rhode Island.

Jan. 13, 2009.

Virginia McGinn, Providence, for Plaintiff.

Janice Weisfeld, Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice FLAHERTY, for the Court.

Before this Court is an appeal by the defendant, Susan LaPlante, from judgments of conviction for fraudulently obtaining public assistance in violation of G.L.1956 § 40–6–15 and for giving a false document to a public official in violation of G.L.1956 § 11–18–1. This case came before the Supreme Court for oral argument on November 5, 2008, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. After hearing the parties' arguments and considering the memoranda submitted by counsel, we are satisfied that cause has not been shown. Accordingly, we will decide the appeal at this time. For the reasons set forth in this opinion, we affirm the judgments of conviction of the Superior Court.

## Facts and Procedural History

The defendant, Susan LaPlante, was charged with welfare fraud in an amount over $500, in violation of § 40–6–15 (count 1); with food-stamp fraud in an amount over $500, in violation of § 40–6–16 (count 2); and with filing a false document with a public agency, in violation of § 11–18–1 (count 3). Susan received a jury trial in Providence County Superior Court in April 2006.[1] A verdict was returned acquitting LaPlante of food-stamp fraud, but convicting her on the charges of welfare fraud and filing false documents.[2] On July 7,

---

1. In this opinion, we refer to the defendant and her husband as Susan and Paul. This is for the purposes of clarity only, and we intend no disrespect by using their first names.

2. General Laws 1956 § 40–6–15 provides:
 "Any person who by any fraudulent device obtains, or attempts to obtain, or aids or abets any person to obtain public assistance, pursuant to this chapter, to which he or she is not entitled, or who willfully fails to report income or resources as provided in this chapter, shall be guilty of larceny and, upon conviction thereof, shall be punished by imprisonment of not more than five (5) years or by a fine of not more than one thousand dollars ($1,000) or both, if the value of the public assistance to which he or she is not entitled shall exceed five hundred dollars ($500), or by imprisonment by less than one year or by a fine of not more than five hundred dollars ($500) or by both, if the value of the public assistance to which he or she is not entitled shall not exceed five hundred dollars ($500)."
 General Laws 1956 § 11–18–1(a) provides:
 "No person shall knowingly give to any agent, employee, servant in public or private employ, or public official any receipt, account, or other document in respect of which the principal, master, or employer, or state, city, or town of which he or she is an official is interested, which contains any statement which is false or erroneous, or defective in any important particular, and which, to his or her knowledge, is intended to mislead the principal, master, employer, or state, city, or town of which he or she is an official."

2006, the trial justice sentenced Susan to a five-year suspended sentence, with five years of probation, for count 1, and a consecutive one-year suspended sentence, with one year of probation, for count 3. The trial justice also ordered her to pay restitution to the state in the amount of $30,335.79. Susan filed a timely notice of appeal. The facts pertinent to this appeal are as follows.

Susan, a mother of three, fell into difficult financial circumstances in December 2002 after her husband, Paul, was arrested and charged with domestic assault and ordered to have no contact with her and their children. Paul was released on bail, and he went to stay with his parents, Ernest and Loraine LaPlante, in Cumberland. On December 9, 2002, as a result of the financial stress caused by the marital separation, Susan went to the Department of Human Services (DHS) to apply for state assistance. She met with Theresa McLean, an eligibility technician with DHS, to fill out an application for various assistance programs, including food stamps and medical assistance. DHS deemed her to be ineligible for food-stamp assistance because of her assets and resources. DHS, however, did grant medical assistance to her and her three children.

DHS determined Susan's eligibility for assistance based on the information that she disclosed in her application for benefits. On the application, Susan indicated that the father of her children was not living in the household. She told McLean that her husband left the home as a result of a domestic-violence arrest. McLean reviewed the application with Susan and specifically highlighted her obligation to inform DHS within ten days if there was a change in her circumstances. Susan did not contact DHS to change the information from that submitted on her application.

Susan also signed DHS applications for childcare assistance on March 10, 2003, September 19, 2003, and March 10, 2004. Each time, she indicated that she was separated, and she did not list her husband as a member of her household. Based upon the information she provided on these applications, she was granted childcare assistance. As was the case with medical assistance, she acknowledged her obligation to update DHS as to any change in her household circumstances, yet she never did. Then around May 2004, DHS received a tip and conducted an investigation that led the state to deduce that Paul was living in the household. When it concluded its investigation, the state brought charges against Susan and prosecuted her for welfare fraud and for providing false documentation to DHS.

At trial, there was conflicting evidence about whether Paul was a member of the household during the time that Susan received assistance. Clearly, the documentation Susan submitted did not disclose that Paul resided in the home. But, Raphael Martinez, an investigator with DHS, testified that around May 2004, he received an anonymous telephone call reporting that Susan's husband was living in the home. Martinez testified that after he received that tip, he reviewed Susan's applications and questioned her ability to pay her fixed expenses on her income alone, so he decided to investigate further. Martinez spoke with two neighbors, and from June 15, 2004, to June 29, 2004, he and his supervisor personally conducted a surveillance of Susan's home in Woonsocket. Martinez testified that on several occasions, he observed Paul leave the house early in the mornings, carrying a lunch bag, and get into a truck registered to him at the Woonsocket address. As a result of his investigation, Martinez concluded that Paul was living in the household. Martinez testified that if Paul was a member of

the household, Susan would not have been eligible for daycare assistance because of Paul's income. Martinez further testified that the total daycare assistance that Susan had received amounted to $24,203. Two neighbors, Steven Girard and Robert Aubin, Jr., also testified at trial. They both said that they believed Paul was living in the family home from June 2003 to June 2004. Girard testified that he personally observed Paul leaving the home in the mornings at around 6:30 and that he occasionally saw his car in the driveway around 10:30 p.m. He also saw Paul playing outside with his children in the evenings and working in the yard. Aubin testified that he frequently saw Paul pulling out of the driveway in the mornings at 6:25.

On the other hand, Susan, Paul, and Paul's parents all testified that Paul was not living with his family from December 2002 until July 2004. Paul testified that he stayed with his parents during that period. He explained that in February 2003, the domestic-assault charges against him were dismissed and the no-contact order that had been issued by the District Court was dissolved. However, Susan then obtained a no-contact order from the Family Court, and Paul filed for divorce. The Family Court order allowed Paul to visit with his children in the family home on Tuesdays and Thursdays and also on weekends, if Susan agreed. Paul testified that on Tuesdays and Thursdays he would visit the children after 5 p.m. and stay until around 10 p.m., when the children went to bed. Susan testified that for much of this time, the relationship between Paul and her was strained. Indeed, she said that she renewed the no-contact order several times and that it remained in effect until August 13, 2003, when Paul terminated the divorce proceedings. Paul testified that after August 13, 2003, there were no restrictions on his visits with the children, and he and Susan began marriage counseling. Paul acknowledged that he visited his children at the family home almost every day, and Susan testified that the marital relationship between Paul and her began to improve. In an effort to explain Paul's presence at the domicile in the mornings, Susan testified that Paul would come to the home early to help get the children ready for school. To explain Paul's presence at the home during the period of DHS surveillance, Susan testified that on June 22, 2004, her son had his tonsils removed and that he was absent from school for a week. She said that to assist with their son's convalescence, Paul remained in the home overnight, sleeping in their son's room. According to Susan, she and her husband reconciled in July 2004, and it was not until then that he moved back into the family home.

### Issue on Appeal

The sole issue before this Court on appeal is the contention that the trial justice erred when he denied a defense motion for a mistrial after a state's witness made an unexpected, but highly prejudicial, comment from the witness stand. During the first day of trial, the prosecution's third witness, Mr. Martinez, was asked to clarify what part of Susan's applications made him question the disparity in her expenses in relation to her income. Martinez responded, "[i]n the application I found information regarding the family-owned timeshares." It was undisputed that the prosecutor did not elicit this answer. In fact, she insisted to the trial justice that she had instructed all witnesses, including Martinez, not to mention the time-shares. The record further reveals that at a pretrial conference in chambers, the prosecutor and defense counsel discussed the time-shares, and the trial justice ordered the state not to educe this information

from the witnesses. On the record, the trial justice acknowledged that he made this ruling because he believed "it would be unnecessarily prejudicial in light of the fact that the jury would learn that she did have other means * * * especially since we knew that timeshares might seem like a real asset but may not be much of an asset."

Immediately after Martinez's response, defense counsel objected and moved for a mistrial. He argued that the testimony was highly prejudicial because of the nature of the charges. Counsel argued that as a result of the jurors learning that Susan owned time-shares, they would believe she could afford vacations. This, he argued, presented a grave and unacceptable danger that the jurors would jump to the conclusion that she was running a "big scam." The prosecutor countered that the time-shares comment was not so prejudicial that a curative instruction could not cure any effect that it might have had on the jury. In her opinion, the comment was fleeting, and she maintained that it was uncertain whether the jurors had even heard or processed the remark. The prosecutor argued that declaring a mistrial would be premature, and she proposed that the jurors undergo voir dire so that the existence of any possible prejudice to Susan might be determined.

At first, the trial justice wavered, and he seemed to agree that Martinez's comment may have been unduly prejudicial. As he considered the motion, he said, "[i]t's sometimes better doing it now than four days into the trial. Nobody likes to declare a mistrial, especially when we had a jury here for the better part of the day. But we might be better off." As the trial justice considered the rescheduling of the trial, possibly later that same week, the prosecutor informed the court that she was court-excused the following Monday. When he heard this, the trial justice decided not to immediately pass the case, and he gave the following instruction to the jury:

"Ladies and gentlemen, you just heard some comments from the witness stand. I'm going to tell you now that I want you to disregard those comments. I told you earlier today that there would be objections where I would instruct you that certain evidence should not have been presented to you, and this is exactly one of those situations. And do you recall me saying to you that the concept is difficult, but I'm essentially saying that I want you to un-ring the bell. And as I asked you earlier this morning, I said, can you abide by that requirement, and I think you all said that you could. So I want you to disregard the last comment that came from the witness in this case; and with that I'm going to have you go upstairs to take your afternoon break." [3]

After the jury left the courtroom, defense counsel pressed his objection, argu-

---

**3.** Earlier that day before opening statements, the trial justice instructed the jury as follows:
 "If I sustain [an] objection, the witness will not answer. But occasionally what will happen is before I have a chance to rule, the witness will respond. * * * When that happens we can have a dilemma because if it's an answer that you should not have heard then somehow you've got to disregard it and when that happens when there is an answer that you should not have heard I'll say to the jury, that answer is to

be stricken, the jury is to disregard that response. Now that's not the easiest of concepts. It's a little like un-ringing a bell. You have heard the answer and now I'm telling you to disregard it. But the oath that you took a little while ago requires you to do just that. So if I say that you are to disregard the response and void it from your mind, that's exactly what you are going to do. Fair enough?"
The jurors then all responded in the affirmative.

ing that it was impossible for the jury to "un-ring the bell" in this circumstance. He vigorously argued that evidence of time-share ownership is too prejudicial in a welfare fraud case. The trial justice, commenting on what he perceived to be the poor acoustics in the courtroom, then decided to question the jurors individually, both to ascertain what, if anything, they heard and to gauge the effect of the comment. Defense counsel also objected to this course of action, pointing out that he had heard the comment from a position in the courtroom farther away from the witness stand than the jury box. The trial justice replied, "I'm not necessarily disagreeing with you, what I am saying now is at least go the extra step and see what they heard and then I'll make a determination."

The trial justice then called each juror into his chambers individually and he asked each whether he or she heard "the last comment the witness made."[4] From the record, it appears that only two jurors specifically said that they heard the testimony about "time-shares." The trial justice asked each of them whether he or she would be influenced by the testimony. One responded that he did not pay attention to the remark because "timeshare could mean anything." Defense counsel then asked the juror if the fact that the defendant was on trial for welfare fraud made the juror suspicious. The juror responded in the negative and affirmed that his or her decision would be based only on proper evidence. The other juror acknowledged hearing "[s]omething like owning a timeshare." The trial justice then asked if the juror would be able to disregard the comment. The juror an-

swered, "Yes. Yes. Yup." Defense counsel then asked whether, given the charge of welfare fraud, the juror would reflect on the fact defendant owned a time-share. The juror firmly responded in the negative. Two other jurors recalled testimony about the family owning condominiums. The trial justice asked these jurors separately if they could disregard the comments, and they both were emphatic that they could.

The rest of the jurors did not specifically recall the time-shares comment. Most of them just remembered something about surveillance or the discrepancy between expenses and income. Even though most of the jurors did not appear to hear anything about time-shares, the trial justice instructed them not to discuss what had occurred in chambers, and they acknowledged that they would disregard the last testimony they heard.

After the voir dire, defense counsel remained steadfast in his position that the case should be passed. He argued that at least three jurors had heard the time-shares testimony, and he was suspicious about whether another juror was reluctant to admit to hearing the comment. However, the trial justice denied the motion before adjourning the proceedings for the day.[5] He concluded:

"I am satisfied, after interviewing each of the witnesses [sic.] individually, that there is not cause for a mistrial at this point. Most of the jurors did not hear the mention of the timeshare and those who did, did not appear to give it any weight and furthermore accepted the Court's direction to totally disregard it from their consideration."

---

4. The trial justice did not repeat the testimony or mention time-shares.

5. The trial justice also denied a request by defense counsel to excuse two of the jurors who heard the time-shares comment. This issue, however, is not before us on appeal.

The trial consumed three more days. After the parties rested, the trial justice instructed the jury, directing them to disregard any testimony to which an objection was sustained. After deliberating for about three hours, the jury returned a verdict, finding Susan guilty of fraudulently obtaining public assistance from March 2003 to June 2004 and guilty of providing false documentation to DHS from March 2003 to June 2004. The panel's verdict was not guilty, however, with respect to the charge of food-stamp fraud.

■ On appeal, Susan argues that the trial justice erred when he denied her motion to pass the case on the first day of trial after the DHS investigator testified that the LaPlante family owned time-shares, because that testimony was highly prejudicial and so inflammatory in a welfare fraud case that it could not be cured by a cautionary instruction, no matter how strong the trial justice's admonition might be. Susan further argues that the voir dire was futile and exacerbated the prejudice caused by the comment; she contends that the trial justice should have granted her renewed motion to pass the case after the individual voir dire was completed. The state counters that the trial justice acted within his discretion not to declare a mistrial, both after the comment was made and after the juror responses to voir dire did not reveal any prejudice toward the defendant arising from the witness's statement. We agree with the state and hold that the trial justice did not abuse his

discretion when he denied defendant's motion to pass the case.[6]

## Standard of Review

■ The decision to pass a case and declare a mistrial belongs to the trial justice, and this Court gives great weight to his or her sound discretion. *See State v. Grant,* 946 A.2d 818, 826–27 (R.I.2008); *State v. Mendoza,* 889 A.2d 153, 158 (R.I. 2005). When ruling on a motion to pass a case, this Court will reverse a trial justice's ruling on appeal only if it was clearly wrong. *See Mendoza,* 889 A.2d at 158. This deference arises from the trial justice's "front-row seat" at trial, where the effect of a witness's imprudent comment on the jury can be best determined. *See id.* (citing *State v. Oliveira,* 774 A.2d 893, 912 (R.I.2001)).

## Analysis

■ "When a party moves to pass the case, the trial justice must assess the prejudicial impact of the statements." *State v. Toole,* 640 A.2d 965, 974 (R.I.1994). When he decides whether or not to declare a mistrial, the trial justice should consider if "the evidence was of such a nature as to cause the jurors to become so inflamed that their attention was distracted from the issues submitted to them." *State v. Pacheco,* 763 A.2d 971, 979 (R.I.2001) (quoting *State v. Brown,* 619 A.2d 828, 831 (R.I.1993)). However, there is no fixed formula for determining prejudice. *See State v. Hoyle,* 122 R.I. 45, 48, 404 A.2d 69, 70 (1979). It is viewed "in the context in

---

6. The state also argues that the verdict supports the trial justice's determination that the jurors were not inflamed because they asked the trial justice a question during deliberation related to the food-stamp charge and then acquitted Susan on that charge. According to the state, this demonstrates dispassionate and mindful deliberation rather than excited passions. Although when examining the effect of

a potentially prejudicial remark in its context, we may reflect on the circumstances surrounding the jury's deliberation and verdict, *see State v. Pugliese,* 117 R.I. 21, 26, 362 A.2d 124, 126–27 (1976), we refrain from addressing this argument and reach our decision that the jury was not prejudiced, notwithstanding the jury's verdict containing a partial acquittal or its question to the trial justice.

which it appeared and in light of the attendant circumstances." *Id.* at 48, 404 A.2d at 71 (quoting *State v. Marrapese,* 116 R.I. 1, 7, 351 A.2d 95, 98 (1976)). Nevertheless, even if the trial justice determines that the remark was prejudicial, he is not required to pass the case. *Toole,* 640 A.2d at 974. "If the trial justice determines that the prejudice is curable, he or she must issue a timely and effective instruction." *Id.*

 Applying these principles to the present case, we do not believe that the trial justice abused his discretion when he denied Susan's motion for a mistrial. In our opinion, the witness's comment was not of such an incendiary nature so as to cause the jurors to become inflamed or prevent their "calm and dispassionate examination of the evidence." *See State v. Parkhurst,* 706 A.2d 412, 427 (R.I.1998). Furthermore, the trial justice's timely curative instructions, his thoughtful and measured subsequent efforts through voir dire to ensure that the jury would be able to comply with his admonition, and his instruction before the panel retired for deliberation more than sufficed to counteract whatever prejudice that had possibly arisen as a result of the witness's statement. *See Mendoza,* 889 A.2d at 159 (trial justice's admonition and subsequent efforts were sufficient to cure minimal prejudice).

Susan, however, argues that the information about time-shares was inherently prejudicial to a defendant in a welfare fraud case because the jurors themselves are the victims as taxpayers, and any in-

structions, therefore, would be futile. We do not disagree that in a vacuum time-share ownership may be prejudicial in a case such as this; however, we determine the effect of a potentially prejudicial remark by examining it within its factual context. *See Pugliese,* 117 R.I. at 26, 362 A.2d at 126–27; *see also State v. Anil,* 417 A.2d 1367, 1373 (R.I.1980) ("On review, we shall consider *ad hoc* the prejudicial effect of challenged remarks in light of the context in which they were uttered.").

 Our conclusions are further solidified by an examination of the entire record. Given the context in which the witness's comment was made, it was unclear whether the jurors even had heard the statement. Furthermore, the record reveals that the comment was both unelicited and fleeting, and the testimony was interrupted by several objections both before and after the words escaped the witness's mouth. The trial justice, therefore, had sufficient grounds to question whether the comment had any prejudicial effect.[7] *See Toole,* 640 A.2d at 974 (trial justice must assess if statement caused prejudice).

 To cure any prejudice, the trial justice also gave a curative instruction within minutes of the testimony. He instructed the jurors to disregard the comment, invoked his earlier instructions analogizing their task to "un-ringing a bell," and reminded the jurors of their duty to disregard testimony when instructed to do so and to act in accordance with their oath as jurors. "This Court assumes that a

7. The defense implies that that the trial justice denied the motion to pass the case because of the prosecutor's scheduling conflicts and because he did not want to further delay the trial. We do not agree because it is clear from the record that after Martinez made the statement, the trial justice decided to assess the prejudicial impact of the comment through voir dire rather than immediately rule on the motion to pass the case. In our opinion, this was a sound response, and he acted within his discretion to first make a determination whether the comment affected the jury. *See State v. Oliveira,* 774 A.2d 893, 910 (R.I.2001) (trial justice has discretion to individually voir dire jury and decision is only disturbed based on abuse of discretion).

jury has followed a trial justice's instructions as they were given." *State v. Young*, 743 A.2d 1032, 1035 (R.I.2000). Furthermore, during the individual voir dire, all the jurors candidly affirmed that they would not be influenced by the comment and that that they would not consider the testimony. *See id.* at 1034–35 (affirming denial of motion for mistrial after jurors in individual voir dire stated they were not prejudiced by another juror's improper remark).

Susan, however, challenges the effectiveness of the trial justice's instructions and voir dire, arguing that the voir dire merely served to exacerbate the prejudice and that it created a quandary for the jury: the trial justice asked them what testimony they heard last, yet they were simply told to disregard it. We see little merit in the contention that the voir dire was futile or counterproductive. During voir dire, the trial justice refrained from calling undue attention to the time-shares comment by asking the jurors only about the last testimony they heard. Furthermore, it is clear from the record that the trial justice was able to adequately probe the jury on the effect of the time-shares remark. Defense counsel and the prosecutor were allowed to pose their own questions to the jurors, and the trial justice, when necessary, asked follow-up questions to determine exactly what the jurors heard. By way of illustration, one juror initially responded that he did not hear the testimony because he was told to disregard it. Counsel, however, pressed him further, and he acknowledged hearing something about wages, although he had trouble hearing the testimony. Another juror commented that he remembered the testimony but was told to forget it, so he crossed off the testimony in his notes. The trial justice, however, inquired further, and the juror replied that the witness "kept saying he didn't understand financially, how, you know, they could survive. She was work-

ing at CVS and the fact—that's about it." Counsel then asked, "do you recall what was said exactly before I objected?" The juror answered that the witness kept repeating the same things and counsel kept cutting him off so he "didn't bother going any further." Still another juror recalled, "he said something about how could a parent, a single parent—I remember it, but you told me to forget it so it doesn't count." Defense counsel then asked, "what exactly did you hear before I objected?" The juror responded, "I thought they were trying to find out—he was—that's why he was investigating because he thought that a single parent with three children couldn't afford a lifestyle that they had."

These interviews reveal that the trial justice was able to effectively and fairly discern what the jurors heard and what impact the witness's comment had on them, if any. The juror interviews also demonstrated that the jurors understood their oaths and underscored their readiness to comply with the court's instructions to disregard Martinez's testimony. Therefore, after viewing Martinez's comment in the context of the testimony in which it was given, and in light of the curative instruction and voir dire, we believe the trial justice was not clearly wrong when he determined that the jury was not affected by any prejudice arising from Martinez's regrettable remark about the time-shares. For all of the foregoing reasons, we conclude that the trial justice did not abuse his discretion when he denied the defendant's motion to pass the case.

### Conclusion

The judgment of the Superior Court is affirmed. The record in this case shall be returned to that tribunal.