**Supreme Court**

No. 2012-361-C.A.

(P1/07-1859AG)

State                              :

v.                              :

Deaven Tucker.                              :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                          :

v.                             :

Deaven Tucker.                 :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Flaherty, for the Court.**   On November 20, 2006, the defendant, Deaven Tucker, along with two accomplices, Jason Ruiz (Ruiz) and Jennifer Duarte (Jennifer), robbed a bank on the East Side of Providence.  However, that crime serves only as a precursor to other criminal activity that arose during the course of this sordid tale.  In the days leading up to the robbery, the defendant had become increasingly distressed that an investigation into a crime that he had orchestrated while he was in Florida several months earlier was catching up with him.  Detectives from the Miami-Dade Police Department had begun questioning everyone who had traveled to Florida with the defendant in an effort to identify the people associated with certain nicknames.  The defendant was highly concerned because he thought it was only a matter of time until Jennifer, who took part in the Florida crime at the defendant's behest, was identified and questioned.  The defendant was determined to prevent that from happening because he believed that, if questioned, Jennifer would implicate the defendant's girlfriend, Victoria Berardinelli

(Berardinelli), or himself in the Florida incident.[1]  To prevent that from happening, the defendant made the callous decision that Jennifer must die.

In the predawn hours of November 21, 2006, less than twelve hours after the bank robbery, Jennifer, defendant, and two others parked their vehicle on the side of Grotto Avenue in Pawtucket.[2]  The defendant lured Jennifer from the car and the pair ventured a short distance down the street.  As they were heading back towards the car, defendant withdrew a semiautomatic handgun and fired one shot at point-blank range into Jennifer's back.  The defendant then straddled Jennifer's fallen body and discharged an additional eight shots into her body, including three shots in her back, one in her upper right arm, and four in her head.  Upon completion of this cold-blooded, ruthless execution, defendant left Jennifer's lifeless, bullet-riddled body where it fell and fled the scene.

Based upon the events of November 20 and 21, 2006, defendant was charged with eleven offenses in a single indictment, most notably the murder of Jennifer Duarte in violation of G.L. 1956 §§ 11-23-1 and 11-23-2.[3]  On March 16, 2010, following a lengthy jury trial in Providence

---

[1] On October 12, 2007, Victoria Berardinelli and defendant, Deaven Tucker, were married at the Adult Correctional Institutions, in part to prevent her from being coerced to testify against defendant.  After the marriage, Berardinelli assumed defendant's last name; however, in order to prevent confusion, we shall refer to her by her maiden name.  Also, Berardinelli and defendant parented two children who were born in 1998 and 2007.

[2] The additional passengers were Jason Ruiz and Dana Wilson.

[3] The eleven charged offenses include: the murder of Jennifer Duarte in violation of G.L. 1956 §§ 11-23-1 and 11-23-2 (count 1), using a firearm when committing a crime of violence, to wit, murder, in violation of G.L. 1956 § 11-47-3.2(b)(3) (count 2), carrying a dangerous weapon while committing a crime of violence in violation of § 11-47-3 (count 3), possession of arms by a person convicted of a crime of violence in violation of § 11-47-5(a) (count 4), carrying a pistol without a license in violation of § 11-47-8 (count 5), four counts of first-degree robbery in violation of G.L. 1956 § 11-39-1(a) (counts 6-9), conspiracy to commit robbery in violation of G.L. 1956 § 11-1-6 and § 11-39-1 (count 10), and using a firearm when committing a crime of violence, to wit, robbery, in violation of § 11-47-3.2(a)(1) (count 11).  Count 3 was dismissed before trial pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure, which provides in pertinent part that "[t]he attorney for the State may file a dismissal of an indictment, information, or complaint and the prosecution shall thereupon terminate."

County Superior Court, guilty verdicts were returned on all counts. On May 10, 2010, the trial justice sentenced defendant to three consecutive life sentences plus an additional thirty-five consecutive nonparoleable years.[4]

On appeal, defendant advances two primary arguments to support vacating his judgments of conviction. First, defendant contends that the trial justice abused his discretion when he admitted character evidence in violation of Rule 404(b) of the Rhode Island Rules of Evidence.[5] Second, defendant claims that he should be granted a new trial because the prosecutor made inappropriate and inflammatory comments during the course of his closing argument. After a careful consideration of defendant's arguments and a thorough review of the record, we affirm the judgments of conviction.

# I

## Facts and Travel

To make sense of the cold-blooded and calculated murder of Jennifer, we must turn our attention to events that occurred several months earlier. In September 2006, defendant and Berardinelli planned a trip to Florida to visit defendant's uncle and inquire about employment prospects at the uncle's auto-detailing business. However, some of defendant's friends learned about the trip, expressed an interest in joining, and were invited by defendant to travel with him and Berardinelli. The new additions to the trip included Zachery Brown (Brown), John Soares

---

[4] Of the thirty-five consecutive nonparoleable years that the trial justice sentenced defendant to serve, ten years were for using a firearm in connection with a crime of violence and twenty-five years were because defendant was determined to be a habitual offender.

[5] Rule 404(b) of the Rhode Island Rules of Evidence provides:

> "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or to prove that defendant feared imminent bodily harm and that the fear was reasonable."

(Soares), Ronald Spearin (Spearin), and Eugenia Gomes (Gomes).[6]  Two rental cars were obtained, and the group departed Rhode Island.  Berardinelli did not travel to Florida in the rental cars; rather, she flew down several days later and was surprised to discover that Jennifer was in Florida with the group.[7]

On the group's final night in Florida, everyone went out to a club in Miami except Brown, who remained at the hotel and went to bed early because he was ill.  At some point after midnight, defendant, Berardinelli, Soares, and Jennifer returned to the hotel room occupied by Brown, whereupon defendant declared that Spearin "had to be taken care of."   Brown testified that defendant then revealed a plan that he had conceived to kill Spearin.  Specifically, defendant instructed that, while Spearin and Gomes were being transported from the hotel at which defendant was staying to their own hotel, Soares would lure Spearin from the vehicle and shoot him.  The defendant explained that, in order to create an alibi, he and Berardinelli would remain at the hotel while Spearin's murder was being carried out.

At trial, Brown testified that defendant's plan was successful and that Soares killed Spearin.  Afterwards, Jennifer and Brown returned to defendant's hotel room in a "frantic" state. Within minutes of their return, Jennifer, Brown, Berardinelli, and defendant had hastily packed their belongings, jumped into the rental car, and began the return trip to Rhode Island.  The defendant ordered that "[e]verybody keep their mouth shut."

During the return trip, defendant commanded Brown to shower in order to "wash off the evidence" from the Spearin murder.  When the group arrived home, they went directly to Jennifer's South Providence apartment.  Once again, defendant directed Brown to shower "[t]o

---

[6] The trial testimony revealed that while in Florida, defendant and his group encountered several acquaintances from Providence, namely Kevin Faria and an individual known as "Gunner."

[7] It appears from the record that defendant was romantically involved with both Berardinelli and Jennifer.  Also, the record is unclear as to how, or with whom, Jennifer traveled to Florida.

wash the gun – the gun residue and the rest of the residue off." Jennifer then showered. While she was doing so, Berardinelli questioned defendant about Jennifer's loyalty to him. Specifically, Berardinelli warned defendant that Jennifer "was going to tell on him." Thereafter, defendant announced that "if anyone from Florida tried to contact [one of you] about the incident," that person should "refuse to answer any questions, and immediately obtain a lawyer."

In the weeks that followed his return to Rhode Island, defendant maintained a low profile, hiding out in various hotels throughout Rhode Island and Massachusetts. Frequently, Jennifer accompanied defendant, staying at the hotels with him. Nonetheless, the investigation into the events that had transpired in Florida was beginning to catch up with defendant.

On November 15, 2006, Berardinelli was contacted by Det. Jose Gonzalez of the Miami-Dade Police Department. Detective Gonzalez, who was conducting a criminal investigation, sought to identify individuals who were associated with certain nicknames. During the questioning, Berardinelli revealed the nicknames for herself, Brown, Soares, and defendant. However, when asked to identify the person who was associated with Jennifer's nickname, Berardinelli told Det. Gonzalez that "she was an acquaintance, someone that's known to her here in Providence that she has seen several times," but she lied and claimed that "she did not know her actual name."

At the conclusion of the interview, Berardinelli informed defendant about what had occurred. The defendant became enraged; he "yelled and screamed" at Berardinelli because she "didn't do what he had originally told [her] to do and refuse to answer questions, and tell them [she] had an attorney." Adding to defendant's consternation was his discovery that several other people had been questioned about the Florida incident, including Kevin Faria, "who told [the detectives] everything."

It appeared to be simply a matter of time until the Florida detectives would be able to identify and question the remaining accomplices, including Jennifer. Berardinelli testified that defendant said he was convinced that Jennifer "would never say anything to go against him or to implicate him because she loved him." However, defendant was concerned that Jennifer might implicate Berardinelli. Berardinelli testified that defendant said he believed that, if questioned, "Jenny was going to substitute herself with [Berardinelli] in the driver's seat of the car [the night of Spearin's murder], and that [Berardinelli] would go to jail, and that Jenny was going to ultimately have [defendant] to herself." As a result, fearing for the welfare of himself and Berardinelli, defendant proclaimed that "he really didn't trust [Jennifer], and that she had to go."

Similarly, Ruiz testified that defendant had voiced concern after he was alerted that the Florida investigation had made its way to Rhode Island. Specifically, Ruiz said that defendant told him that he "didn't trust [Jennifer]" because he was convinced that "she would tell on him over something that happened in Florida." As a result, Ruiz said, defendant solicited him to kill Jennifer. Specifically, Ruiz said that defendant instructed him to hide near Jennifer's apartment until he lured her outside, at which point Ruiz was to shoot and kill her. However, defendant was unable to coax Jennifer out of her apartment and simply told Ruiz to "forget it, because [Jennifer's] son was upstairs with her."

Ruiz also testified that, on the evening of the aborted attempt to murder Jennifer, defendant informed him that, on November 20, 2006, "there's going to be a good, good lick." Ruiz explained that a "good lick" meant a "chance or possib[ility to] get a lot of money." On November 19, 2006, defendant clarified that the following day they were going to rob a bank. Ruiz said that defendant explained that he and Ruiz would enter the bank and commit the robbery and that Jennifer would drive a getaway car. Jennifer borrowed her sister's car on the

day of the robbery, agreeing to return it by 3:00 p.m. That evening, Jennifer, Ruiz, and defendant spent the night at Jennifer's South Providence apartment.

The following day, they prepared for the impending bank robbery. In an attempt to conceal their identities, defendant and Ruiz outfitted themselves from head to toe in black clothing; however, only defendant, and not Ruiz, secured gloves to wear during the robbery. The pair also purchased bandanas to cover their faces. Next, they began canvassing Providence area banks in search of a bank that had neither security officers nor bulletproof glass. To that end, Jennifer reconnoitered several banks in the city; eventually, they arrived at the Sovereign Bank on Elmgrove Avenue. Jennifer cased the bank and determined that it had neither security officers nor bulletproof glass, making it the ideal target.

Shortly before 3:10 p.m., Ruiz and defendant got out of the car operated by Jennifer and put defendant's plan into action. According to the testimony elicited at trial, Ruiz entered the bank first and ordered the tellers to put the money in his bag.[8] The tellers complied; however, Ruiz became impatient and began reaching into the cash drawers himself. Meanwhile, defendant remained near the entrance to the bank lobby, maintaining order by brandishing his gun and threatening to open fire. Ruiz testified that, after they had been in the bank for about forty seconds, defendant told him that it was time to leave. As a result, Ruiz and defendant scampered from the bank and re-entered the car with Jennifer.

The trio proceeded to a motel, where they were met by Berardinelli, defendant's eight-year-old son, Deaven Jr., and defendant's half-brother, Dana Wilson. The proceeds were counted and amounted to about $50,000. Ominously, when Jennifer was out of earshot, defendant spoke with Berardinelli, Ruiz, and Wilson and declared that "he had used Jenny as

---

[8] Three tellers on duty at Sovereign Bank during the robbery provided nearly identical versions of the events that unfolded during the robbery.

much as he could. He didn't trust her anymore and she had to go." The defendant propositioned Wilson and Ruiz to see if they would murder Jennifer. Wilson testified that defendant first turned to him and said, "[y]ou can have [Jennifer's] share of the money [from the bank robbery] if you kill her." To defendant's dismay, Wilson declined to kill Jennifer for $10,000, her share of the robbery proceeds, explaining that "[h]e didn't want to kill her. He wanted no part of any of it." Next, Berardinelli and Wilson testified that defendant made the same offer to Ruiz; kill Jennifer in exchange for her share of the robbery proceeds. Berardinelli and Wilson testified that Ruiz responded affirmatively, "F--- it. I'll kill her. I don't care." However, shortly thereafter, Ruiz experienced a change of heart and said that he would not participate in defendant's money-for-murder scheme. At that point, Ruiz testified, defendant said he would "take care of it." Later that evening, Jennifer, Wilson, Ruiz, and defendant drove around the Providence area and eventually arrived in Pawtucket and parked the car on Grotto Avenue.

The defendant then carried out the murder of Jennifer. Once the deed was done, defendant ran to the car, entered the vehicle, and warned Ruiz and Wilson "[h]ear no evil, see no evil, speak no evil." After the group fled the scene, Wilson said, defendant reminded him to "[k]eep your mouth shut. You're my brother. I'll f------ kill you." Sometime after midnight, defendant arrived at Berardinelli's condo, entered her bedroom, and handed her a shopping bag containing a sock with his gun inside. The defendant told Berardinelli he had just done "the hardest thing he ever had to do" and he instructed her to hide his gun outside; she hid it in a nearby park. The defendant also directed Berardinelli to destroy the distinctive blue fur coat that he had been wearing the night of Jennifer's murder.

In early December 2006, Berardinelli, Ruiz, Wilson, and defendant visited Atlantic City, New Jersey. While in New Jersey, defendant told Berardinelli and Wilson that he could no

longer trust Ruiz because he had not worn gloves during the bank robbery. The defendant suspected that investigators would link Ruiz to the bank robbery and that eventually Ruiz "was going to open his mouth and tell all." As a result, defendant declared that Ruiz "had to go" and that "[h]e didn't want [Ruiz] to come back to the State of Rhode Island." Berardinelli and Wilson disagreed, telling defendant that he was "nuts" and that he should "[l]et the kid live." Eventually, defendant relented. Berardinelli and Wilson also persuaded defendant to dispose of the gun he had used in Jennifer's murder before he returned to Rhode Island. On December 9, 2006, the group departed Atlantic City for Rhode Island.[9]

Meanwhile, major headway was made by the Providence Police Department in their investigation into the Sovereign Bank robbery. Detectives had lifted a latent fingerprint, later determined to be Ruiz's, from a teller's cash drawer. Ruiz was contacted by his mother, who said that the police had been to her home and that they wanted Ruiz to turn himself in for questioning. On December 12, 2006, Ruiz, accompanied by a lawyer who had been retained by defendant, turned himself in to the police. Ruiz was arrested on the spot. Later that day, authorities also arrested defendant.

During the time that defendant was incarcerated awaiting trial, Berardinelli visited him on numerous occasions and she testified about a number of their conversations. With respect to Jennifer's death, Berardinelli testified that defendant told her that he was "impressed with the way that she took it. * * * she took it like a soldier. She didn't run. She didn't cry. She didn't beg for her life. She just said, 'Deaven, please no.' And that was it." On another occasion, defendant told Berardinelli that Wilson, his half-brother, "knew too much, and he was a liability, and that he had to go." She said that defendant explained that Wilson was a drug dealer who was

---

[9] The testimony was that the group broke apart defendant's gun and threw the pieces into the ocean.

bound to be caught by the authorities and, when that happened, Wilson would implicate defendant both in the bank robbery and Jennifer's murder. Therefore, Berardinelli said, defendant suggested that she lure Wilson into a local field under the pretext that they were recovering the robbery proceeds and then shoot and kill Wilson. However, Berardinelli said that she refused because she was pregnant with defendant's second child.

On a separate occasion, Berardinelli said that she and defendant discussed Susan Duarte. Berardinelli observed that defendant should be worried about Susan's testimony because she would be sure to elicit sympathy from the jury at defendant's trial for Jennifer's murder. The defendant agreed and said that he believed "[s]he had to go" and indicated that he would have two of his associates take care of Susan outside of Rhode Island. Berardinelli also testified that defendant told her that she had to "start coaching" her co-workers into unwittingly creating an alibi for him for the bank robbery. Specifically, defendant wanted Berardinelli to repeatedly tell her co-workers that he had picked her up from work at 2:30 p.m. on the day of the robbery, because he firmly believed that the more often you say something, the more likely it is that people will believe it. Similarly, Brown testified that defendant spoke with him in an attempt to create an alibi with regard to Jennifer's murder. Brown said that defendant wanted him to offer a local stripper by the name of Tiffany $5,000 to say that she was with defendant in the early-morning hours of November 21, 2006; however, Brown never complied.

After trial, the jury found defendant guilty on all counts, and the trial justice sentenced him to three consecutive life sentences plus an additional thirty-five consecutive nonparoleable years. On May 11, 2010, defendant filed a timely notice of appeal.

## II

## Issues on Appeal

On appeal, defendant advances two primary arguments to support his appeal. First, defendant argues that the trial justice abused his discretion when he admitted certain Rule 404(b) evidence. Specifically, defendant challenges the admission of evidence relating to: (1) the Florida incident; (2) the Spearin murder; and (3) the subsequent investigation spearheaded by Det. Gonzalez.

Second, defendant contends that the trial justice erred when he denied his motion for a mistrial after Ruiz revealed, during cross-examination by defendant, that he knew that the term "good lick" meant a robbery because he had previously taken part in such acts with defendant.

Third, defendant claims that the trial justice's failure to grant a mistrial based on the prosecutor's inappropriate and inflammatory comments during closing argument constituted reversible error.

## III

## Discussion

## A

## Rule 404(b) Evidence

## i

## The Florida Evidence

Before the trial started, the state filed a motion in limine, seeking the court's guidance with respect to the admissibility of certain Rule 404(b) evidence. The state argued that the Florida evidence was necessary to demonstrate defendant's motive for killing Jennifer and to provide the jury with an accurate description of the sequence of events leading up to Jennifer's

murder. The defendant objected; he argued that the Florida evidence should be excluded because its admission would violate the dictates of Rule 404(b) and because it was extremely prejudicial, as set forth in Rule 403 of the Rhode Island Rules of Evidence.[10]

After a lengthy hearing, the trial justice ruled that the Florida evidence did not exceed the bounds established by Rule 404(b) and that it would be admitted. The trial justice explained that determining the admissibility of uncharged acts requires a bifurcated inquiry under Rules 404(b) and 403. First, the court must ensure that the proffered evidence is relevant to the proof of a significant issue in the case and not offered simply to show a defendant's propensity for wrongdoing. After making such a finding, the trial justice must then undertake a Rule 403 analysis to determine whether the evidence's "probative value is substantially outweighed by the danger of unfair prejudice."

Here, the trial justice found that the Florida evidence was probative as to defendant's motive for killing Jennifer, namely, to prevent her from exposing him to prosecution for the Florida crime. The trial justice found that the evidence of defendant's motive was "powerful, relevant and extraordinarily significant" and determined that it should not be kept from the jury. In fact, the trial justice stated that, "[i]n the end, it is the motive that drives this murder; the motive to eliminate Jen Duarte." However, recognizing the powerfully prejudicial effect that evidence of this nature might have on defendant, the trial justice then subjected the Florida evidence to a Rule 403 analysis. After completing that task, the trial justice concluded that the potential prejudice of the evidence did not override its relevance and probative value. In addition, he explained that the jury should be permitted to hear the Florida evidence in order "to

---

[10] Rule 403 of the Rhode Island Rules of Evidence provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

allow the jury to have a complete and, hopefully, coherent story" because "to try to separate out the Florida events would be to effectively remove from the [s]tate's quiver its sharpest arrow: the motive for the defendant's allegedly having killed [Jennifer]."[11]

During the course of trial, the state called multiple witnesses to testify about the events that had occurred in Florida. Immediately before that testimony was elicited, defendant renewed his objection to the admission of the evidence based upon Rules 404(b) and 403, objections that were overruled by the trial justice. Nonetheless, in an attempt to follow the dictates of State v. Pona, 948 A.2d 941 (R.I. 2008) (Pona I), the state advised that it would not use the term "murder" in reference to the Florida incident.[12] Instead, the state said it would refer only to "a plan to hurt someone, someone being hurt," and also that Brown heard gunshots while Spearin was being "hurt." The trial justice said that the state was entitled to call it a murder through their witnesses. Specifically, the trial justice explained to the state that "[y]ou want to call it a murder through your witnesses, go right ahead. I gave you permission. If you want to slow it down, water it down, diminish it for the sake of the defendant's exposure in this case, I commend you for having done so. It's up to you."

At trial, Det. Gonzalez was the first witness to testify with respect to the Florida incident. Detective Gonzalez explained that, during the course of a criminal investigation, he questioned Berardinelli about the people associated with certain nicknames. However, Det. Gonzalez never revealed the nature of the crime that he was investigating, nor did he describe the underlying

---

[11] This Court has previously explained that, "[u]nder Rule 403, '[i]t is only evidence that is marginally relevant and enormously prejudicial that must be excluded.'" State v. Shelton, 990 A.2d 191, 202 (R.I. 2010) (quoting State v. Hak, 963 A.2d 921, 928 (R.I. 2009)).

[12] In State v. Pona, 948 A.2d 941, 953 (R.I. 2008), we held that the "quantum of evidence" admitted at trial relating to a separate murder resulted in extreme prejudice to the defendant and warranted a new trial. However, we explained that "we will not go so far as to deny the prosecution the opportunity to make any reference to the fact that [the] defendant was charged with [a separate] murder * * * ." Id.

facts. At the end of Det. Gonzalez's direct examination, the trial justice provided a limiting instruction to the jury.[13]

The next witness to testify about the Florida events was Brown. Brown testified about the details of the plan that defendant had conceived to murder Spearin and that he heard several gunshots while the plan was carried out. However, at no point during his testimony did Brown use the term "murder." Instead, Brown only spoke of a plan to "hurt" Spearin. After this testimony, the trial justice provided another limiting instruction to the jury.[14]

Finally, Berardinelli testified about the events that took place on the night of Spearin's murder. Specifically, Berardinelli testified that defendant ordered Soares to "take care of" Spearin with the assistance of Brown and Jennifer. As was the case with the other witnesses, Berardinelli never mentioned a "murder" nor did she lay out the specifics of what had transpired. Once again, as he did after the other witnesses describing the Florida events had concluded their testimony, the trial justice provided a cautionary instruction, reminding the jury of the limited purposes for which they were allowed to consider the Florida evidence.[15]

Before us, defendant argues that, notwithstanding the trial justice's cautionary instructions and the absence of the term "murder" from the testimony, the trial justice nevertheless abused his discretion when he admitted the Rule 404(b) evidence. The defendant contends that the Florida evidence was propensity evidence that suggested to the jury that,

---

[13] The trial justice reminded the jury that testimony regarding other uncharged misconduct "is admitted only for certain limited purposes; as it may, in your minds relate to [defendant's] motive or intent or plan with respect to the charges for which he is presently on trial before you."

[14] Specifically, the trial justice re-emphasized to the jury that they were only allowed to consider the Florida evidence for the limited purpose of "defendant's motive, his intent, or his plan with respect to the charges for which he's on trial here in Rhode Island."

[15] Moreover, immediately before closing arguments, the trial justice provided the jury with another instruction that the Florida evidence "was admitted only for the very limited purpose as it may, in your minds, relate to the defendant's motive or his intent or his plan with respect to the charges for which he is presently on trial."

because defendant allegedly orchestrated Spearin's murder, he must have committed the murder of Jennifer as well.

## 1

## Standard of Review

It is firmly established that "[t]he admissibility of evidence is within the sound discretion of the trial justice, and this Court will not interfere with the trial justice's decision unless a clear abuse of discretion is apparent." State v. Gautier, 950 A.2d 400, 411 (R.I. 2008) (quoting State v. Brown, 900 A.2d 1155, 1159 (R.I. 2006)). Equally entrenched in our jurisprudence is the "long history of prohibiting the use of 'other crimes, wrongs, or acts' as evidence to prove the propensity of a defendant to commit crimes." Pona I, 948 A.2d at 949 (quoting Rule 404(b)). "The overriding policy of excluding such evidence * * * is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice." Id. (quoting State v. Gallagher, 654 A.2d 1206, 1210 (R.I. 1995)). Therefore, "evidence of a defendant's bad character or criminal disposition may not be admitted to prove his or her propensity to commit crime * * * ." Brown, 900 A.2d at 1160 (quoting State v. Baptista, 894 A.2d 911, 914-15 (R.I. 2006)).

"[H]owever, when relevance exists for purposes other than to show propensity, there are exceptions to the general rule that permit such evidence to be admitted." Pona I, 948 A.2d at 949 (citing State v. Martinez, 651 A.2d 1189, 1194 (R.I. 1994)). "Rule 404(b) contains a list of exceptions, including when the evidence offered establishes the motive or intent of the defendant, or when it is relevant to prove a material element of the crime with which the defendant is charged." Id. (citing Gallagher, 654 A.2d at 1210).

Also, "[e]vidence that may otherwise be admissible under Rule 404(b) is still subject to the Rule 403 balancing test, which excludes otherwise relevant evidence 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury * * * .'" State v. Clay, 79 A.3d 832, 838 (R.I. 2013) (quoting Rule 403). Therefore, evidence admitted under Rule 404(b), "like all evidence, must survive Rule 403 scrutiny." State v. Pona, 66 A.3d 454, 466 (R.I. 2013) (Pona II) (citing State v. Gaspar, 982 A.2d 140, 148 (R.I. 2009)). "However, 'a trial justice's discretion to exclude evidence under Rule 403 must be used sparingly. * * * It is only when evidence is marginally relevant and enormously prejudicial that a trial justice must exclude it.'" Pona II, 66 A.3d at 466 (quoting State v. Smith, 39 A.3d 669, 675 (R.I. 2012)).

**2**

**Was the Evidence Properly Admitted?**

Before the trial began, when considering the state's motion in limine, the trial justice engaged in the careful weighing analysis that is required when considering evidence that is offered pursuant to Rule 404(b). He reasoned that the Florida evidence was relevant and probative because it demonstrated defendant's motive for killing Jennifer. Specifically, the trial justice found that the evidence of defendant's motive was "powerful, relevant and extraordinarily significant" and that its probative value was not outweighed by its potential prejudice. We agree. The defendant had a motive to kill Jennifer because she might later expose defendant, or Berardinelli, to prosecution for the Spearin murder, something defendant was determined to prevent from happening. In our opinion, the trial justice properly exercised his discretion when he admitted evidence of the Florida murder under Rule 404(b).

However, the trial justice did not end his analysis there. After determining that the evidence met the test of Rule 404(b), he balanced the relevance and probative value of the Florida evidence against its potential prejudice, as he is required to do under Rule 403. The trial justice determined that the probative value of the evidence was not outweighed by the potential for prejudice, and he indicated that his conclusion was further buttressed by the state's decision to refrain from referring to the Florida incident as a murder. Finally, the trial justice provided multiple limiting instructions to the jury throughout trial, including immediately after the Florida events were brought to light, as well as before closing arguments. Accordingly, in light of the trial justice's thorough and careful analysis, as well as his numerous limiting instructions, we can discern no abuse of discretion in admitting the Florida evidence.

## ii

### "Good lick" Testimony

Next, defendant argues that the trial justice erred when he declined to declare a mistrial after Ruiz revealed, while he was being cross-examined by defendant, that he understood the term "good lick" to mean a robbery because he had previously perpetrated such acts with defendant. The defendant contends that this testimony "easily could have distracted the jurors from the issues at hand and allowed them to convict [d]efendant based upon evidence that he and Ruiz were seasoned robbers." However, before Ruiz testified, the trial justice conducted an extensive voir dire of Ruiz, wherein the witness said that he decided to testify against defendant, in part, because he was afraid defendant would "snitch" on him about other "robberies and a shooting." Ruiz further explained that he was talking about robberies and a shooting that were not the subject of defendant's trial. Consequently, defense counsel was on notice that, according to Ruiz, he and defendant had acted together in the past in committing other robberies and a

- 17 -

shooting. In fact, the trial justice cautioned defense counsel about the dangers of this very line of questioning because "it is going to open a door to expose your client to other shootings and other robberies." Defense counsel acknowledged that it "[m]ay well do that," but he decided to proceed nonetheless.

At the conclusion of the voir dire, defense counsel continued his cross-examination of Ruiz. The record reveals the following:

> "[Defense Counsel]: Okay. Now, I think you indicated that at – shortly before the Monday of 11-20 of '06, that the defendant indicated that he was going to – there's going to be a good lick?
> "[Ruiz]: Yes.
> "[Defense Counsel]: Is that right? That's a chance to get some money?
> "[Ruiz]: Yes. A lick is robbery. It's a slang term for, like, robbery.
> "[Defense Counsel]: So, when you say that the defendant mentioned that, then you knew he was talking about a robbery?
> "[Ruiz]: Yes.
> "[Defense Counsel]: Not something else?
> "[Ruiz]: But I knew – but – knew it was a robbery, but I didn't know what kind of robbery, because I had before done things like that with [defendant]."

Immediately after Ruiz's revelation about past transgressions he had committed with defendant, the trial justice granted defendant's motion to strike that statement from the record. At the very beginning of the next trial day, defendant moved to pass the case. After hearing argument from the parties and reviewing a transcript of the proceedings from the previous day, the trial justice ruled on the motion to pass. In so doing, the trial justice summarized the voir dire testimony of Ruiz that had taken place outside the presence of the jury, during which Ruiz acknowledged that he had committed other robberies and shootings with defendant. The trial justice observed that defense counsel, whom he described as "a paragon of the ability to defend criminal cases," had been "forewarned" that Ruiz had participated in uncharged robberies with defendant. Despite

being alerted to the dangers, however, the trial justice noted that defense counsel continued to repeatedly question Ruiz about how he knew what the term "lick" meant.

## 1

### Standard of Review

"The decision to pass a case and declare a mistrial belongs to the trial justice, and this Court gives great weight to his or her sound discretion." State v. LaPlante, 962 A.2d 63, 70 (R.I. 2009) (citing State v. Grant, 946 A.2d 818, 826-27 (R.I. 2008)). As such, "this Court will reverse a trial justice's ruling on appeal only if it was clearly wrong." Id. (citing State v. Mendoza, 889 A.2d 153, 158 (R.I. 2005)). A mistrial shall be declared when an "inappropriate remark [or action] has so inflamed the jurors that they no longer would be able to decide the case based on a calm and dispassionate evaluation of the evidence." State v. Lynch, 854 A.2d 1022, 1033 (R.I. 2004) (quoting State v. Werner, 830 A.2d 1107, 1113 (R.I. 2003)).

## 2

### Analysis

After a review of the record, it is our firm conclusion that the trial justice did not err when he denied defendant's motion to pass. First, defense counsel had been forewarned that Ruiz had committed uncharged robberies and a shooting with defendant in the past. Nonetheless, he continued to probe Ruiz about how he knew a "good lick" was a robbery. As we have previously explained, "when counsel goes fishing on cross-examination, he cannot assume that in playing with fire, he will not get burned." State v. Edwards, 478 A.2d 972, 975 (R.I. 1984). Immediately after Ruiz blurted out that he "had before done things like that with [defendant]," the trial justice ordered the statement stricken from the record. We find no fault

with the trial justice's actions, and conclude that he did not err when he denied defendant's motion to pass on the basis of Ruiz's "good lick" testimony.[16]

## B

## Closing Argument

The defendant's final argument on appeal is that the prosecutor made inappropriate and inflammatory comments during his closing argument that warrant a new trial. In particular, defendant takes issue with three separate statements made by the prosecutor during closing argument.

## i

## Standard of Review

This Court has previously explained that "there is no formula in law which precisely delineates the proper bounds of a prosecutor's argument * * * ." State v. Boillard, 789 A.2d 881, 885 (R.I. 2002) (quoting State v. Mancini, 108 R.I. 261, 273-74, 274 A.2d 742, 748 (1971)). Generally, a prosecutor "is given considerable latitude in closing argument, as long as the statements pertain only to the evidence presented and represent reasonable inferences from the record." State v. Horton, 871 A.2d 959, 965 (R.I. 2005) (quoting Boillard, 789 A.2d at 885). Thus, a prosecutor's comments will be deemed inappropriate when they "are totally extraneous to the issues in the case and tend to inflame and arouse the passions of the jury." Id. at 965 (quoting Boillard, 789 A.2d at 885).

---

[16] The defendant also argues that the cumulative effect of the Rule 404(b) evidence constituted reversible error. However, in light of our holding that there was no error, we conclude that his argument has no merit. The trial justice undertook a thorough, well-reasoned analysis before admitting any of the Rule 404(b) evidence. He found, and we agree, that the evidence was relevant and probative as to defendant's motive for murdering Jennifer.

**ii**

**Analysis**

First, defendant argues that the prosecutor inappropriately suggested to the jury that defense counsel had been manipulated by defendant and that counsel had adopted defendant's mantra that if you say something often enough it becomes the truth.[17] The defendant contends that the prosecutor implied that defense counsel "was doing [d]efendant's bidding [which] encouraged the jury to disbelieve anything said by defense counsel and to convict [d]efendant because of his all-encompassing manipulative nature." However, our review of the record provides no support for defendant's argument. To the contrary, the prosecutor was commenting on the evidence that had been introduced at trial, namely Berardinelli's testimony that defendant wanted her to "start coaching the kids that I worked with; that I had to start putting ideas into their head, because the more you talk about something around someone, and the more you repeat it, that – and they hear it, that they start to believe it to be a memory." The prosecutor properly alluded to defendant's "coaching" comments, especially in light of defense counsel's suggestion during closing argument that it was Ruiz, not defendant, who murdered Jennifer. It is our opinion that the prosecutor's statement did not exceed the "considerable latitude" he was allowed

---

[17] The following transpired during the prosecutor's closing argument:

> "[Prosecutor]: When Ms. Tucker was telling [about defendant attempting to enlist Berardinelli and others to create false alibis], she said that when [defendant] got something in his head, his angle on things was if you say it often enough, it becomes the truth.
>
> Now, I'm not going to for a second suggest that having been associated with [defendant] for all this time, that [defense counsel] has adopted [defendant's] mantra, but, in his closing argument --
> "[Defense Counsel]: Well, I object to this.
> "[The Court]: Overruled.
> "[Prosecutor]: [Defense counsel] suggested over and over and over again that Jason Ruiz killed Jennifer Duarte. The facts simply don't support that. The evidence simply doesn't support that. The testimony simply doesn't support that."

as it "pertain[ed] only to the evidence presented." Horton, 871 A.2d at 965 (quoting Boillard, 789 A.2d at 885).

Second, defendant argues that the prosecutor improperly referred to "victim impact evidence that was not introduced into evidence before closing arguments." Specifically, he complains that the prosecutor said as follows: "For the Duartes, it's a tragedy; a hundred-percent tragedy. For Susan, her mother, [Jennifer's son] – and, by the way, do you think [Jennifer's son] misses his mother any more just because she might not have had him every night?"[18] The defendant maintains this comment was impermissible "victim impact evidence." We cannot agree. During trial, defense counsel probed a number of the state's witnesses about the nature of Jennifer's relationship with her son. In particular, defense counsel asked Jennifer's sister, Susan, about how much time Jennifer spent with her son. In response, Susan explained that her mother "baby sat [Jennifer's son] all the time." Since defendant questioned a number of witnesses about Jennifer's relationship, or lack thereof, with her son, it was in the record and therefore proper fodder for the prosecutor's closing argument. See Horton, 871 A.2d at 965. Nothing the prosecutor said was "totally extraneous to the issues in the case [nor did it] tend to inflame and arouse the passions of the jury." Id. (quoting Boillard, 789 A.2d at 885).

Lastly, the defendant argues that the prosecutor improperly discussed the events that transpired in Florida at great length, drawing the jurors' attention to the Rule 404(b) evidence that he argues was inadmissible. However, because we have affirmed the trial justice's admission of that evidence, the prosecutor's reference to it in his closing argument was not improper in any way.

---

[18] Read in the proper context, it is obvious that the prosecutor misspoke here and meant to ask the jury to consider whether Jennifer's son missed his mother any less – not more, simply because she was not with him every night while she was alive.

# IV

## Conclusion

For the foregoing reasons, we affirm the judgments of conviction. The papers shall be remanded to the Superior Court.



# RHODE ISLAND SUPREME COURT CLERK'S OFFICE

## *Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**    State v. Deaven Tucker.

**CASE NO:**    No. 2012-361-C.A.
(P1/07-1859AG)

**COURT:**    Supreme Court

**DATE OPINION FILED:**  April 2, 2015

**JUSTICES:**    Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**    Associate Justice Francis X. Flaherty

**SOURCE OF APPEAL:**    Providence County Superior Court

**JUDGE FROM LOWER COURT**:

    Associate Justice Robert D. Krause

**ATTORNEYS ON APPEAL:**

    For State:  Christopher R. Bush
          Department of Attorney General

    For Defendant:  George J. West, Esq.