**Supreme Court**

No. 2013-221-C.A.

(W1/10-413A)

State                                      :

    v.                                     :

Kimberly Fry.                              :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

|  |  |
|---|---|
| State | : |
| v. | : |
| Kimberly Fry. | : |

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Indeglia, for the Court.**  On October 6, 2011, a Washington County Superior Court jury found the defendant, Kimberly Fry (defendant or Kimberly), guilty of second degree murder of her eight-year-old daughter in violation of G.L. 1956 § 11-23-1.  On May 22, 2012, the trial justice sentenced the defendant to a term of forty years' imprisonment, with twenty years to serve and the remaining twenty years suspended, with probation.

On appeal, the defendant contends that the trial justice erred in:  (1) declining to instruct the jury on voluntary manslaughter due to diminished capacity and inadequately instructing the jury on accident; (2) permitting the state to elicit testimony from a witness through improper impeachment and leading questions; (3) failing to declare a mistrial following the state's violation of the court's sequestration order; and (4) allowing admission of a video depicting the scene of the murder, including the victim's body.  For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

# I

## Facts and Travel

On October 8, 2010, Kimberly was charged by indictment with the murder of her daughter, Camden. The case was tried before a jury over the course of three weeks in September and October 2011. Throughout the course of this trial, the following facts were revealed through the testimony of the various witnesses.

Camden Alexis Fry was born on May 6, 2001 to Kimberly and Timothy (Tim) Fry[1] in New Hampshire, where the family lived at the time. While Tim went to work during the day, Kimberly stayed home and took care of Camden. During Camden's early-childhood years, Tim and Kimberly began to notice that she had difficulty with transitioning from one activity to another, often protesting when she was forced to end an activity.

In August 2007, the Fry family moved to North Kingstown and Camden started first grade at Fishing Cove Elementary School. After the move, Camden began to struggle academically and continued to have difficulty with transitioning between activities. For instance, Camden would cry and scream when taken to the store if she did not get what she wanted, forcing Kimberly to drag her out of the store. On one occasion, when Tim was away on business, Kimberly reported to him that Camden had a "really bad crying episode" and that Camden had "been punching her and hitting her and that [Kimberly] had to sit on her."

In the belief that Camden might have attention deficit disorder (ADD) or attention deficit hyperactivity disorder (ADHD), the Frys sought to have her evaluated through the school but, according to Tim, the school did not want to spend the funds to get her tested. Eventually, while Camden was in second grade, the Frys took matters into their own hands. Kimberly began

---

[1] We use the first names of Kimberly Fry, Tim Fry, and Camden Fry to avoid confusion.

researching private schools that might provide a better academic environment for Camden, and, in April 2009, the family began seeing a family therapist, Wendy Phillips (Phillips), to aid them in developing strategies to help Camden cope with the symptoms that she was exhibiting. In addition, the Frys scheduled a neuropsychological evaluation for Camden with Christine Trask, Ph.D. (Dr. Trask). As a result of this evaluation, Dr. Trask issued a report diagnosing Camden with ADHD and mild anxiety.

On July 1, 2009, based upon the diagnosis from Dr. Trask, Camden was prescribed medication used to treat ADHD. Tim and Kimberly noticed that the medication helped keep Camden calm and helped with her ability to transition. Nevertheless, Tim and Kimberly observed that she sometimes became more irritable in the evening as the medication wore off.

Throughout this period of time, Kimberly was also suffering from various mental health issues, including depression, insomnia, anxiety, and panic attacks. During a counseling session on May 4, 2009, Kimberly explained to Phillips that she felt as though Camden's crying and screaming episodes lasted longer for her than for Tim. Kimberly further reported to Phillips that Camden's tantrums caused her stress and, after about twenty minutes, she would put her hands over her ears to block out the sound of Camden's crying and screaming.

Phillips testified at trial that the last two therapy sessions before Camden's death, on July 28 and August 4, 2009, were particularly difficult for Kimberly. Throughout these two sessions, Phillips observed that Kimberly seemed overwhelmed by the process of buying a new car, necessitated by her involvement in a car accident several days prior to the July 28 session. In addition, Phillips reported that Kimberly was upset and angry with Tim; in fact, at the July 28 session, Phillips asked Camden to leave the room because Tim and Kimberly were arguing. Phillips's notes from that session indicated that, during their arguments, "Kim[berly] began to

triangle Camden with her father" by asking Camden to take sides between her and Tim "[i]n an inappropriate manner." Phillips further reported that, after Camden had left the room, Kimberly told her that "she blamed Camden for her depression" and that "she was an incompetent mother and she felt hopeless." By the end of the session, Phillips instructed Tim that "if he was concerned about [Kimberly's] behavior, that if she appeared to not be safe or he was concerned about her, to take her to the emergency room immediately." Phillips also recommended that Kimberly make an appointment with an individual therapist. At the session on August 4, Kimberly "seemed better than the prior session." Nevertheless, Phillips again recommended that she make an appointment with an individual therapist.

Tim testified that, on August 10, 2009, Kimberly told him that she "wished that Camden wasn't around because it was so much easier when it was just the two of us." Tim replied that he didn't think that this was an appropriate thing for her to say. After this discussion ended, Tim and Kimberly spent the day signing the paperwork for Kimberly's new car and returned home at around 3:30 that afternoon. Camden, who had spent the day at the beach with friends, returned home sometime between 4 and 4:30. At approximately 5:50 that evening, Tim left the house to play hockey. When he left, Kimberly and Camden were sitting next to each other in the living room watching television.

Tim received a phone call from Kimberly just after 9:00 that night. He asked her how the night was going, to which she responded that "after a two-hour crying fit Camden had finally settled down and gone to bed." Tim testified during trial that Kimberly "sounded a little groggy" during this conversation, but that she was nevertheless clear in speaking to him. He further testified that it was not out of the ordinary for Kimberly to be groggy, as "[s]he normally had taken [C]lonazepam or Benadryl at night * * * so she could get to sleep."

- 4 -

Tim arrived home at approximately 9:40 that night and, upon entering the living room, noticed that Kimberly was "kind of falling asleep, leaning over against the side of the couch." He testified that she seemed "more groggy than she was on the phone" and suggested that she should go to bed. He then removed his hockey equipment from his car and again told Kimberly that she should go to bed. Tim went to shower, passing Camden's bedroom on the way. When he passed Camden's bedroom, he looked in and noticed that she was in bed under the covers. After showering, Tim realized that Kimberly was still sitting on the couch, so he helped her up and walked her into the bedroom. Tim testified that he didn't recall Kimberly ever previously needing assistance to get into bed.

The following morning, Tim had planned to work from home; but, by 9:30 he realized that it was unusual that Camden was still sleeping. He went into her bedroom to check on her and realized that she was in the same position that she had been in the night before. When he walked over to the side of the bed, he noticed that her eyes were opened and her pupils were completely dilated. He started screaming, pulled the covers back, and removed a stuffed animal that she had under her arm. Tim turned her onto her back and, at that point, determined that she was not alive because she was "ice cold and stiff." He called 911 and screamed for Kimberly to come into the room, who—still groggy—crawled into the room on her hands and knees.

When police and rescue personnel arrived, they found Tim and Kimberly in Camden's bedroom crying and hysterical. Once Camden had been pronounced dead, the police asked Tim and Kimberly to leave the room to allow them to secure the scene. Officer John MacCoy (Officer MacCoy), a responding officer, asked Kimberly about the prior evening with Camden, to which she replied that Camden had been giving her a hard time in taking a bath. She recounted to Officer MacCoy that Camden fell on the bathroom floor and that she ultimately had

to pull Camden into the bedroom. She further reported to the police that she then watched television and read books with Camden until about 9:10 when she put her to bed.

Officer MacCoy testified that, after being present while a pastor read Camden her last rites, the Frys went to the back porch, and Kimberly's condition began to deteriorate. Tim testified that Kimberly looked up at him, and it occurred to him that she must have taken some kind of medication. He then told Officer MacCoy to call an ambulance and went to the kitchen to discover that several bottles of prescription medication were empty.

Kimberly was transported to South County Hospital by rescue, and she was placed in the intensive care unit (ICU). Tim testified that he visited Kimberly the following day in the hospital, and she told him that "she had a battle with Camden, [and] that Camden had been kicking and punching her and biting her." She further relayed that, at one point during the "battle," she went to take Clonazepam to calm down and, when she returned, they started fighting again. Tim testified that Kimberly told him that "Camden was punching and kicking and biting her and that she sat on top of her" and that Kimberly had "put her hand over Camden's nose and mouth to make her stop screaming." He testified that Kimberly then said, "I'm so sorry, I'm so sorry."

Kimberly also made several statements to medical personnel. Courtney Briar Pichardo, Kimberly's nurse in the ICU, testified that on the night that Kimberly was admitted she was not oriented as to whether it was daytime or nighttime, but she was able to identify who the president was and she knew that she was in the hospital. Pichardo further testified that Kimberly stated, "I'm her mother. I was supposed to protect her but I couldn't protect her from me." Barbara Kettle, a patient care technician who was also in the room with Kimberly on the night that she

- 6 -

was admitted, testified that Kimberly stated that she had taken Benadryl, muscle relaxers, and some other medication, because "[s]he wanted the crying and screaming to stop."

During the trial, on October 4, 2011, the defense submitted proposed jury instructions, including a request for an instruction on accident and on voluntary manslaughter due to diminished capacity. That same day, the trial justice held a charging conference in chambers, during which he indicated that he was going to deny defendant's request for a diminished capacity instruction. The conference was not recorded, and there is nothing to indicate whether defendant objected to the denial of the diminished capacity instruction or merely argued for such an instruction prior to the trial justice's decision. The trial justice charged the jury on October 5, 2011, omitting an instruction for voluntary manslaughter due to diminished capacity. Following the charge, defense counsel objected at sidebar to the fact that the instruction "just briefly" discussed accident,[2] but failed to object to the lack of an instruction on voluntary manslaughter due to diminished capacity.

On October 6, 2011, during their deliberations, the jury submitted a question to the trial court: "Does there have to be mental competency for there to be intent?" After meeting with the prosecutor and defense counsel to develop an answer to this inquiry, the trial court sent the jury the following answer:

> "A defendant's competency to stand trial is a legal determination made before trial and is not an issue before you.
>
> "Do not confuse 'mental competency' with the defendant's state of mind or intent.
>
> "Please refer to the jury instruction on DEFENDANT'S INTENT."

---

[2] Defense counsel also objected to the judge's instruction regarding expert testimony. However, this objection is not pertinent to the issues on appeal.

After this answer was submitted to the jury, the parties met in chambers to discuss these supplemental instructions and note any potential objections on the record. At that point, defense counsel conceded that he had failed to object to the lack of a diminished capacity instruction at the time the jury was charged, but he nevertheless requested that one be given at that time. However, the conference was interrupted because the jury had reached a verdict.

The jury found Kimberly guilty of second degree murder of Camden. The defendant moved for a new trial, which the trial justice denied. The defendant timely appealed.

## II

### Issues on Appeal

The defendant raises four issues on appeal. First, she submits that the trial justice erred in declining to present the jury with an instruction on voluntary manslaughter due to diminished capacity[3] and that the trial justice's instruction on accident was inadequate. Second, she claims that the trial justice improperly allowed the state to employ leading questions on direct examination and improperly allowed the state to impeach a witness by use of prior inconsistent statements. Third, she asserts that the trial justice erred by declining to pass the case when the prosecutor conferred with his witness during breaks in testimony, which she contends was in violation of a sequestration order. Finally, she claims that the trial justice erred by admitting into evidence a seven-minute video of the crime scene, which included three and one-half minutes showing Camden's body in her bed.

---

[3] We note that the trial justice did instruct the jury on involuntary manslaughter, stating, in pertinent part: "[M]anslaughter is the unlawful but unintentional killing of a human being without malice or premeditation. A person who recklessly does an act that results in the death of another human being is guilty of manslaughter, even though she did not intend or did not contemplate such a result."

# III

## Discussion

### A

### Jury Instructions

"Our standard of review concerning jury instructions is well settled; we review such instructions in a <u>de novo</u> manner." <u>State v. Adefusika</u>, 989 A.2d 467, 475 (R.I. 2010) (citing <u>State v. Palmer</u>, 962 A.2d 758, 764 (R.I. 2009)). This standard of review is applicable whether our review is focused on the content of jury instructions or on a trial justice's refusal to instruct the jury on a lesser-included offense. <u>See</u> <u>State v. Ricci</u>, 54 A.3d 965, 971 (R.I. 2012); <u>State v. Motyka</u>, 893 A.2d 267, 281 (R.I. 2006).

When determining whether a trial justice's refusal to give an instruction was warranted, "this Court will examine the record in the case and determine whether the evidence justifies such an instruction." <u>Motyka</u>, 893 A.2d at 281. In making this determination, our review is limited to "ascertaining whether 'an actual and adequate dispute exists as to the distinguishing element between the lesser and greater offenses in question.'" <u>Id.</u> (quoting <u>State v. Garcia</u>, 883 A.2d 1131, 1137 (R.I. 2005)). On the one hand, the trial court should instruct the jury on a lesser-included offense when "some minimal evidence exists that, if credited by the jury, could support a conviction for the lesser-included offense." <u>Id.</u> at 284 (quoting <u>State v. McGuy</u>, 841 A.2d 1109, 1112 (R.I. 2003)). On the other hand, however, this Court has repeatedly recognized that "a trial justice is not required to instruct the jury on a lesser-included offense when the evidence presented at trial completely fails to support such a charge[.]" <u>Id.</u> at 285 (citing <u>McGuy</u>, 841 A.2d at 1112).

The focus of our review is different, however, when reviewing the content of jury instructions. In such circumstances, "it is our role to examine the instructions in their entirety to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them, * * * and we review challenged portions of jury instructions in the context in which they were rendered." Adefusika, 989 A.2d at 475 (quoting State v. John, 881 A.2d 920, 929 (R.I. 2005)). In so doing, we remain mindful that the trial justice need not use particular words in the instruction, and we look only to whether the trial justice correctly stated the applicable law. Ricci, 54 A.3d at 971. Particularly pertinent to the case at hand, "[t]his Court has consistently held that when the 'requested charge is fairly covered in the general charge,' the 'trial justice's refusal to grant a request for jury instruction is not reversible error.'" Id. (quoting State v. Price, 706 A.2d 929, 934 (R.I. 1998)). "[E]ven if we conclude that a jury instruction was erroneous, reversal is warranted 'only if a jury could have been misled to the prejudice of the complaining party.'" Adefusika, 989 A.2d at 475 (quoting State v. Graham, 941 A.2d 848, 855 (R.I. 2008)).

### 1. Diminished Capacity

The defendant contends that the evidence on the record could sustain a verdict for voluntary manslaughter due to diminished capacity and, therefore, it was error for the trial justice to refuse to give such an instruction. The state responds that defendant waived any argument as to this instruction because defense counsel failed to object before the jury retired to deliberate. The state further contends that, in any event, there was no credible evidence as to defendant's diminished capacity at the time of the murder and, thus, such an instruction was not warranted. Given that the state's waiver argument, if correct, would end our inquiry, we address this argument first.

- 10 -

In accordance with our well-settled "raise-or-waive" rule, claims of error that were not effectively raised and articulated at trial are deemed to be waived and not preserved for appellate review, subject only to exception in some circumstances where "basic constitutional rights are concerned." State v. Figuereo, 31 A.3d 1283, 1289 n.7 (R.I. 2011) (quoting State v. Donato, 592 A.2d 140, 141 (R.I. 1991)); see also State v. Gomez, 848 A.2d 221, 237 (R.I. 2004) (citing Donato, 592 A.2d at 141); State v. Markarian, 551 A.2d 1178, 1183 (R.I. 1988). Similarly, Rule 30 of the Superior Court Rules of Criminal Procedure serves to bar a party from contesting jury instructions when that party fails to timely object. Specifically, Rule 30 provides, in pertinent part:

> "No party may assign as error any portion of the charge or omission therefrom unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the party's objection. Objections shall be made out of the presence of the jury."

Notably, Rule 30 requires only that objections be made before the jury retires to deliberate, but "does not explicitly mandate that objections to instructions be made after the instructions are given." State v. Palmer, 962 A.2d 758, 766 n.5 (R.I. 2009). Nonetheless, such an objection must be made on the record and in a manner that permits this Court to conduct appropriate appellate review.

In the case at hand, defendant asserts that defense counsel objected to the omission of a diminished capacity instruction in an off-the-record chambers conference held before the jury was charged. The defendant points to excerpts from the record in which the parties and the trial justice refer to a request for a diminished capacity instruction made at the off-the-record conference as evidencing defendant's objection. However, our reading of the record reveals that, at best, it is ambiguous as to whether defendant objected to the trial justice's refusal to include a diminished capacity instruction or merely reiterated her request for such an instruction in the off-

the-record conference. Given that an objection must be made on the record and articulated in such a manner that permits this Court to conduct appellate review, we conclude that the defendant's reference to a diminished capacity instruction in the off-the-record conference was insufficient to properly preserve the issue for our review. See State v. Anderson, 752 A.2d 946, 951 (R.I. 2000).

In a last-ditch effort to redeem her diminished capacity argument, defendant asseverates that her opportunity to object under Rule 30 was renewed when the jury, during its deliberations, asked the question, "Does there have to be mental competency for there to be intent?" In support, defendant contends that this Court's decisions in State v. Oliveira, 730 A.2d 20 (R.I. 1999) and State v. Gomes, 590 A.2d 391 (R.I. 1991) permit a defendant to have a second bite at the apple in objecting to jury instructions if the jury requests clarification of the instructions during its deliberations and the trial justice delivers faulty supplemental instructions in response.

The defendant's interpretation of our case law is flawed. Never in Oliveira, 730 A.2d at 25, nor in Gomes, 590 A.2d at 394, did we hold that juror confusion would somehow render Rule 30 nugatory. In those cases, we were faced with a challenge to the supplemental instructions provided by the trial justice after the jury had asked a question.[4] While we did hold that a trial justice, after the jury indicates that it does not understand an element of the offense charged, is "obligated to clarify the matter for the jury in a concrete and unambiguous manner," we did not go so far as to suggest that juror confusion presented the parties with an opportunity to suggest the addition of another instruction entirely. See Gomes, 590 A.2d at 394. In the case

---

[4] In State v. Gomes, 590 A.2d 391, 394 (R.I. 1991), we considered a defendant's objection to the lack of responsiveness to the jury's question and the confusing nature of the supplemental charge. Similarly, in State v. Oliveira, 730 A.2d 20, 25 (R.I. 1999), we were faced with an objection to a trial justice's supplemental instructions in which the trial justice erroneously instructed the jury with regard to a crime of which the defendant had not been charged.

at hand, we are not faced with a situation where the trial justice provided the jury with an erroneous answer to the question presented or a faulty supplemental instruction. Indeed, the answer provided to the jury both directly addressed the question presented and accurately explained the law. Moreover, in Oliveira and Gomes we were faced with a direct challenge to a supplemental instruction provided by the trial justice. As such, we considered only the faultiness of the supplemental instruction; we did not suggest that a juror question would allow a party another opportunity to object to the original instructions. Thus, our decisions in Oliveira and Gomes are inapposite to the case at hand.

We pause to note that defendant's suggestion that a juror question presents another opportunity to add a certain instruction to the trial justice's original charge is impractical. Not only would it be entirely unfair to the opposing party, but it would be exceedingly suggestive to the jury by placing this new instruction in a special light. We decline to interpret our case law to reach such an unpalatable result.

Given our conclusion that defense counsel failed to preserve the issue for our review, we need not determine whether there was sufficient evidence presented at trial to warrant an instruction on voluntary manslaughter due to diminished capacity.

### 2. Accident

We proceed next to defendant's contention that the trial justice erred by delivering an inadequate instruction on accident in light of the evidence introduced at trial. At trial, defendant presented expert testimony from Dr. Elizabeth Laposata (Dr. Laposata) regarding the cause of Camden's death. Doctor Laposata testified that Camden's injuries were consistent with an attempted restraint procedure and explained that "sometimes * * * the person who is trying to restrain the other person will keep the restraint maneuvers on after the person is calm just

- 13 -

because they are not sure that they have actually gotten that person under restraint." Doctor Laposata also testified that, once Camden had passed out, chest compressions alone could have been sufficient to deprive her of oxygen. On the basis of this testimony, defendant requested the following instruction:

> "If you find that the [s]tate has not proven to you beyond a reasonable doubt that Kimberly Fry acted with 'malice,' or with the momentary intent to kill, or with criminal negligence, but that the death of Camden Fry instead was accidental, then such a killing is neither murder nor manslaughter."

The trial justice charged the jury and did not include the specific instruction requested by defendant. Instead, the trial justice provided an alternative instruction on accident in two separate contexts. The trial justice first instructed the jury on accident in his discussion of the willful and malicious nature of second degree murder. Specifically, he stated:

> "Second-degree murder * * * is a murder that is willful and malicious. And in order to convict the defendant of second-degree murder under this theory, the [s]tate must prove beyond a reasonable doubt, one, that the defendant acted willfully, intended to kill, and in fact, did cause the death of Camden Fry, and, two, the defendant acted with malice.
>
> "An act is done willfully if it is done intentionally and voluntarily and not by mistake or accident or some other reason." (Emphases added.)

The trial justice again discussed accident later in his instructions, this time referring to it as it may negate defendant's intent:

> "Intent ordinarily may not be proved directly because there is no way of fathoming or scrutinizing the operations of the human mind. You may, however, infer a defendant's intent from all the surrounding circumstances. You may consider any statement or act done by the defendant, and all other facts and circumstances that are in evidence which may indicate the state of her mind.
>
> "An act is done intentionally and deliberately and purposefully and not because of mistake or accident or any other innocent reason." (Emphasis added.)

In responding to defendant's objection that the instructions "just briefly" discussed accident, the trial justice noted that "there are at least two places" where the jury was told that a finding of

- 14 -

mistake or accident precluded them from concluding that an essential element of second degree murder was established and, therefore, he denied defendant's request.[5]

Despite the two instructions on accident, defendant asserts that the evidence warranted a more specific one. She contends that, without a more specific instruction like the one she requested, "[i]t is very likely that most jurors failed to even notice that accident was mentioned at all, much less comprehend the necessity and critical implications of their findings on accident." However, in our opinion, the trial justice's instructions adequately convey that the jury could not find defendant guilty of second degree murder if Camden's death occurred by accident. Specifically, the instructions indicate that second degree murder must be committed willfully and that, if the death were accidental, then it could not be willful. The instructions further describe that, if defendant's actions were accidental, then they cannot be considered intentional acts of defendant for purposes of the jury's determination of second degree murder. It is well settled in this jurisdiction that "[t]he trial justice need not use particular words in the instruction, but must 'correctly state[] the applicable law.'" State v. Cipriano, 21 A.3d 408, 423 (R.I. 2011) (quoting State v. Imbruglia, 913 A.2d 1022, 1030 (R.I. 2007)). We are satisfied that the instructions provided to the jury in this case meet this criterion.

In addition, contrary to defendant's suggestion, there was minimal evidence presented at trial from which the jury could conclude that Camden's death was accidental. Instead, any hope of the jury finding accident would have to be predicated on defendant's statements to others that she was attempting to get Camden to stop crying by putting her hands on Camden's mouth and sitting on her, or derived from Dr. Laposata's testimony that Camden's injuries were consistent with an attempted restraint procedure. Given the dearth of evidence upon which a jury could

---

[5] The trial justice also doubted that there was sufficient evidence to support an accident instruction.

- 15 -

conclude that the killing occurred by accident and in light of the instructions given by the trial justice—which twice mentioned accident as a bar to a finding of culpability—we cannot conclude that a more elaborate instruction was necessary.  Accordingly, we are satisfied based on an examination of the record that the trial justice instructed the jury adequately concerning defendant's claim of accidental homicide.[6]

## B

## Complaints Directed at the State's Examination of Phillips

## 1. Improper Impeachment

Next, defendant argues that the trial justice erred in allowing the prosecutor to ask Phillips to read from her therapy notes during her direct examination.  Specifically, defendant points to nine instances in which she asserts that the prosecutor was improperly allowed to "dictate" the testimony of Phillips, which she claims served to improperly impeach Phillips's credibility.  The defendant asserts that Phillips's credibility was instrumental to her defense because she had observed defendant's behavior and mental health close in time to Camden's death.  In our opinion, however, defendant failed to preserve this issue for appellate review.

"This Court staunchly adheres to the 'raise or waive' rule, which requires parties to raise an issue first in the trial court before raising it on appeal." Figuereo, 31 A.3d at 1289.  This rule

---

[6] The dissent juxtaposes the accident instruction given by the trial justice in this case with the one given by the trial justice in State v. Drew, 919 A.2d 397 (R.I. 2007), suggesting that this Court referred to the trial justice's mention of accident in Drew as an "anemic reference."  On that basis, the dissent claims that the "almost identical instruction" in this case could not have adequately apprised the jury of the defendant's accident defense.  However, in Drew, the premise of our opinion was that the scant evidence of accident proffered at trial did not warrant a more comprehensive accident instruction.  Id. at 404.  In the case at hand, not only was there minimal evidence to support an accident defense, but the trial justice also gave a more detailed instruction than the one given in Drew—here, twice mentioning accident.  As in Drew, "any further mention of accident in the charge probably would have served only to confuse or mislead the jury."  See id. at 405.

serves as an "important guarantor of fairness and efficiency in the judicial process" by requiring issues to be presented to a trial justice "in such a posture as to alert the trial justice to the question being raised." State v. Moten, 64 A.3d 1232, 1238 (R.I. 2013) (quoting DeMarco v. Travelers Insurance Co., 26 A.3d 585, 628 n.55 (R.I. 2011) and Figuereo, 31 A.3d at 1289). For this reason, "[a] party who fails to record his specific objections is deemed to have waived his rights on appeal." State v. Estrada, 537 A.2d 983, 987 (R.I. 1988) (emphasis added). "[W]e have repeatedly cautioned that 'a general objection is not sufficient to preserve an issue for appellate review; rather, assignments of error must be set forth with sufficient particularity to call the trial justice's attention to the basis of the objection.'" Moten, 64 A.3d at 1238 (quoting Union Station Associates v. Rossi, 862 A.2d 185, 192 (R.I. 2004)).

As an initial matter, defendant failed to object at all to seven out of the nine instances to which she now assigns error. Without any objection on the record, the trial justice did not have an opportunity to consider the issue and, therefore, any argument regarding these seven instances is deemed waived. See Figuereo, 31 A.3d at 1289. As to the other two instances, the only adequate basis that defendant articulated below suggests that her objection was to improperly refreshing the witness's recollection or on the basis of the rule of completeness. Specifically, defendant's first objection—posed when the prosecutor asked Phillips to read from her notes—stated: "I already offered this into evidence. I understand the [s]tate is not submitting it into evidence, therefore, I think it is inappropriate that the witness read from the transcript. I think she should be allowed to simply testify to her memory." This objection can, at best, be interpreted as taking issue with the state improperly refreshing the witness's recollection by asking her to read from her notes. Her second objection—set forth when the prosecutor directed Phillips to review her notes—stated: "Judge, again, I'm simply going to have to object. I have

- 17 -

no objection to this going in full." This statement appears to suggest the rule of completeness as grounds for her objection. Importantly, neither of these objections can be construed as suggesting that the state was improperly impeaching the witness based on a prior inconsistent statement, which defendant now argues on appeal. Accordingly, because defendant's "assignment[] of error [was not] set forth with sufficient particularity to call the trial justice's attention to the basis of the objection" that defendant now argues on appeal, the issue is deemed waived and not preserved for our review. See Moten, 64 A.3d at 1238 (quoting Union Station Associates, 862 A.2d at 192).

## 2. Leading Questions

The defendant next takes issue with the prosecutor's use of leading questions during the direct examination of Phillips. Specifically, defendant lists forty-five questions posed by the prosecutor that she labels as leading and argues that such use was excessive, unnecessary, and prejudicial. However, defendant failed to object to forty-four out of the forty-five instances which she now attacks on appeal. In fact, she later characterized her refusal to object as a strategic decision, stating that defendant "didn't object to [the state's] leading questions all the time because, frankly, we would have been on our feet 90 percent of the time objecting, and we don't want to give that impression to the jury." Nevertheless, whether strategic or not, defendant's failure to object places her plaint toward the forty-four questions squarely within our "raise-or-waive" rule and, thus, her contention with regard to these forty-four questions is not preserved for our review. Thus, for purposes of this appeal, we consider only the sole question to which defendant objected.[7]

---

[7] Notably, the thrust of defendant's argument on appeal appears to attack the cumulative effect of the leading questions posed by the state, contending that the overwhelming quantity of leading questions rendered them prejudicial. However, given that she failed to object to these leading

"A leading question is most generally defined as a question that suggests the desired answer." State v. Whitaker, 79 A.3d 795, 813 (R.I. 2013) (quoting State v. Gomes, 764 A.2d 125, 137 (R.I. 2001)). "The danger of a leading question is that it may suggest to the witness the specific tenor of the reply desired by counsel and such a reply may be given irrespective of actual memory." Id. (quoting State v. Girouard, 561 A.2d 882, 888 (R.I. 1989)). "Although leading questions generally are prohibited on direct examination, they may be allowed for a limited purpose such as to guide the testimony of a hostile or a purportedly forgetful witness." State v. McManus, 990 A.2d 1229, 1236 (R.I. 2010). "A party is entitled to treat a forgetful witness as adverse; and, in an effort to elicit truthful testimony from the witness, the examiner may resort to leading questions." Id. Further, "[w]hile it is true that as a general rule leading questions are prohibited on direct examination, a trial justice has considerable latitude in sustaining or overruling objections to leading questions." Whitaker, 79 A.3d at 813 (quoting Gomes, 764 A.2d at 137). Thus, "a trial justice's decision regarding the use of leading questions 'will be overturned only upon an abuse of discretion or where there is substantial injury to the defendant.'" Id. (quoting Gomes, 764 A.2d at 137).

When the forty-four waived claims of error are stripped away and the dust has settled, defendant's lone preserved contention regarding leading questions lacks force. The defendant

questions, thus implicating our "raise-or-waive" rule, her argument in this regard is undermined substantially. While this result may seem harsh, we have recognized that "[n]ot only does the rule serve judicial economy by encouraging resolution of issues at the trial level, it also promotes fairer and more efficient trial proceedings by providing opposing counsel with an opportunity to respond appropriately to claims raised." State v. Carpio, 43 A.3d 1, 8 (R.I. 2012) (quoting State v. Burke, 522 A.2d 725, 731 (R.I. 1987)). Here, the state was unable to correct its questioning because defendant did not present it as an issue to the trial court. Without objection from defendant, the cumulative effect of the state's questioning does not transform the questioning into reversible error.

takes issue with the state's question presented to Phillips where—referencing Phillips's therapy notes—the state asked, "Why don't you continue with the next seven typed lines. Do you ever reference Tim and a difficulty with Tim; yes or no?" The defendant objected on the grounds that this was a leading question, to which the state responded that "[the state] move[s] hostile witness, * * * inability to cross-examine." The trial justice overruled defendant's objection, stating, "I'm going to give [the state] some leeway just to phrase some yes-or-no questions. I'm not even sure they are leading if there is a choice between yes or no." While the trial justice did not explicitly state that he found the witness to be hostile, he was not required to do so in giving the state some flexibility in examining the witness. Our review of the record suggests that there were some instances in which Phillips was corrected by the prosecutor after testifying to details that varied from her therapy notes and other instances in which Phillips testified to a lack of memory. Given these difficulties, we cannot conclude that the trial justice abused his discretion in allowing the state some flexibility to pose questions in yes-or-no form.

## C

### Violation of the Sequestration Order

The defendant also claims that the trial justice erred in refusing to pass the case after the prosecutor discussed testimony with the state's witness, Dr. William Cox (Dr. Cox), a medical examiner, during breaks in Dr. Cox's testimony. The defendant claims that this discussion violated the trial justice's sequestration order and that the measures taken by the trial justice to temper the potential prejudice to defendant were insufficient.

Following opening statements, the trial justice granted the parties' joint request for a general sequestration order prohibiting any trial witness from listening to the testimony of any other witness. Thereafter, on September 26, 2011, Dr. Cox took the stand as a witness for the

state and testified over the course of three days. At the conclusion of his testimony on September 26, the trial justice stated to Dr. Cox: "Please don't discuss the case with anyone else. All witnesses for this trial are sequestered." The following day, during his continued direct examination, Dr. Cox testified that he had not reviewed photographs taken by law enforcement at the murder scene and that he did not know whether such photographs were ever sent to the medical examiner's office. However, during a lunch break shortly thereafter, the prosecutor conferred with Dr. Cox about his prior testimony and, as a result of this discussion, Dr. Cox realized that he had made a mistake in his testimony. After looking through his file, Dr. Cox concluded that he had in fact received the photographs the prosecutor asked about. The prosecutor also discussed potential cross-examination with Dr. Cox. Specifically, the prosecutor discussed Dr. Cox's failure to dissect the hyoid bone, which defendant claims is pertinent to the potential of chest compression as a cause of death. The defendant contends that the cause of death was relevant to her accident defense and was a major point of contention between Dr. Cox and her expert witness, Dr. Laposata.

When Dr. Cox returned to the stand after the lunch break, the prosecutor again asked Dr. Cox whether he had seen photographs from law enforcement taken at the scene. This time, Dr. Cox testified that he had "misspoke" and that he had been shown a compact disc (CD) of photographs from the North Kingstown Police Department.

On September 28, 2011, outside the presence of the jury, defense counsel informed the trial justice that she saw the prosecutor talking with Dr. Cox and Det. Jeffrey St. Onge of the North Kingstown Police Department, and did not think anything of the discussion until Dr. Cox corrected his prior testimony. Defense counsel then moved for a mistrial on the grounds that the

prosecutor improperly conferred with Dr. Cox during the break in testimony. In the alternative, she also moved to strike the problematic testimony from the record.

The prosecutor admitted that he spoke to Dr. Cox during breaks in the testimony regarding the photographs and chest compression as a potential cause of death, including mention of the hyoid bone. The trial justice stated that he told each witness "not [to] discuss your testimony with anyone," and specifically "recall[ed] telling Doctor Cox, do not discuss your testimony[.]" However, the trial justice determined that the "precise parameters" of his order were an issue because he did not specifically tell Dr. Cox "not [to] consult with anybody, including the [s]tate's attorney." On that basis, he determined that the prosecutor had not "done anything improperly in this case" and denied defendant's motion for a mistrial. Nevertheless, the trial justice fashioned a remedy allowing defendant to "inquire of [Dr. Cox] and suggest that he may have violated the [c]ourt's order," and said that defendant was "also free to fashion an appropriate question that suggests perhaps a recall of certain testimony was, in fact, prompted by that consultation during the middle of [Dr. Cox's] testimony."

During cross-examination of Dr. Cox, defense counsel took advantage of the opportunity offered by the trial justice and inquired into whether he had been ordered not to discuss his testimony. However, the trial justice did not permit defense counsel to ask whether his discussion with the prosecutor was in violation of the trial court's order.[8] The trial justice reasoned that he did not want the question to insinuate that there had been a violation of the sequestration order when he did not determine that there had been one in the first instance, stating that he would "[l]et the jurors determine that." Following this ruling, defense counsel questioned Dr. Cox in regard to whether he had spoken with the prosecutor about his testimony.

---

[8] Importantly, this was the only limitation imposed on defense counsel in his cross-examination of Dr. Cox based on the allegedly improper discussion.

In particular, defense counsel made apparent to the jury that Dr. Cox originally testified that he did not review any crime scene photographs, but that after his discussion with the prosecutor he testified that he did remember reviewing the photographs.

"The decision to pass a case and declare a mistrial belongs to the trial justice, and this Court gives great weight to his or her sound discretion." State v. Tucker, 111 A.3d 376, 388 (R.I. 2015) (quoting State v. LaPlante, 962 A.2d 63, 70 (R.I. 2009)). "As such, 'this Court will reverse a trial justice's ruling on appeal only if it was clearly wrong.'" Id. (quoting LaPlante, 962 A.2d at 70). "We give great deference to the trial justice in this regard because he or she 'has a front-row seat at the trial and is in the best position to determine whether a defendant has been unfairly prejudiced.'" State v. Tully, 110 A.3d 1181, 1191 (R.I. 2015) (quoting State v. Oliveira, 882 A.2d 1097, 1127 (R.I. 2005)).

In the case at hand, the trial justice's order was not violated by the prosecutor discussing testimony with Dr. Cox during a break in his testimony. The trial justice's instructions to Dr. Cox prior to recessing for the day on September 26 indicated that the witness was not to discuss the case "with anybody,"[9] but did not preclude the witness from discussing his testimony with the prosecutor.[10] We note that, in cases where a witness's testimony is protracted over the course of multiple days, it is commonplace for the party calling that witness to discuss the

---

[9] The only instruction that Dr. Cox received prior to the allegedly improper discussion with the prosecutor occurred on September 26. At that point, Dr. Cox was instructed at the close of his testimony: "Please don't discuss the case with anyone else. All witnesses for this trial are sequestered." Doctor Cox was also instructed on September 27, "I ask you, Doctor, not to discuss your testimony as all of the witnesses have been sequestered." However, this instruction occurred after the witness's discussion with the prosecutor.

[10] Indeed, even the trial justice refused to conclude that his sequestration order was violated. Instead, he stated that the "precise parameters" of his order were an issue because he did not tell Dr. Cox, "do not consult with anybody, including the [s]tate's attorney." We note that a trial court's interpretation of its own order should be accorded great weight. See United States v. Sepulveda, 15 F.3d 1161, 1177 (1st Cir. 1993). With that principle in mind, we decline to attach a more sweeping interpretation to the trial justice's order than did the trial justice himself.

witness's testimony during breaks. Without a request from counsel for a specific instruction or an instruction that specifically proscribes discussion with the prosecutor, which would only be granted in extraordinary circumstances, we cannot interpret the trial justice's order to have such breadth as to alter typical trial practices.

Further, even if the court's order had been violated, the trial justice's imposed remedial measure—allowing the defense attorney to question Dr. Cox regarding his allegedly improper discussion with the prosecutor—effectively negated any potential prejudice from this discussion. See State v. Staffier, 21 A.3d 287, 293 (R.I. 2011) (concluding that any potential harm to the defendant was addressed by the trial justice allowing the defendant to elicit testimony from a witness regarding the witness's questionable violation of the court's sequestration order). Where a defendant's contention is grounded in her fair-trial rights, such as is the case here, "we shall reverse only for an abuse of discretion that results in actual prejudice to him." State v. Gomes, 690 A.2d 310, 318 (R.I. 1997). In the case at hand, the record makes clear that there was no actual prejudice to defendant. The discussion between the prosecutor and Dr. Cox involved only two topics: (i) Dr. Cox's review of photographs of the crime scene taken by the North Kingstown Police Department; and (ii) the hyoid bone as it related to chest compression as a potential cause of death, which the prosecutor regarded as a probable topic to come up on cross-examination.

First, with regard to the prosecutor consulting with Dr. Cox about the crime scene photographs, the only effect that such consultation with the prosecutor could have had was to allow Dr. Cox to correct his prior testimony without impeaching him in the presence of the jury. Thus, the only potential prejudice flowing from the discussion would be the withholding of some information from the jury that would be pertinent to evaluating the witness's credibility. See

Gomes, 690 A.2d at 318. However, by permitting defense counsel to inquire on cross-examination into the trial justice's order and the prosecutor's discussion with Dr. Cox, the jury was allowed to use this information to evaluate the credibility of the witness. See id.

Second, the trial justice's remedial measure would also have allowed defense counsel to negate any prejudice with regard to the prosecutor's discussion of the potential cross-examination on cause of death. Defense counsel was not prohibited from asking questions about the content of the prosecutor's discussion with the witness, including whether the prosecutor had prepared the witness for cross-examination. While such questioning would have served to temper any prejudice, defense counsel failed to ask any questions in that regard. Defense counsel's failure to take full advantage of the remedial measure offered by the trial justice cannot somehow be transformed into reversible error.

When the potential violation of a sequestration order is at issue, the court's response should focus on what needs to be done to prevent any prejudice to the defendant. See Gomes, 690 A.2d at 318; see also United States v. Magana, 127 F.3d 1, 6 (1st Cir. 1997). We conclude that the trial justice's crafted remedial measure was sufficient to temper any potential prejudice to defendant. Accordingly, we hold that the trial justice did not err in refusing to implement defendant's additional suggested remedial measures.

**D**

**Admission of the "Seven Minute-Plus" Video**

The defendant's final assignment of error is that the trial justice erred in admitting a "seven minute-plus" video showing the police walking through the Fry home and depicting Camden's body. The defendant argues that the video's focus on Camden's body in her bed unfairly prejudiced the jury and inflamed their passions against her. The defendant further

- 25 -

asserts that the video was minimally probative because the layout of the Fry home was not contested by the defense and because the scenes depicted in the video were cumulative of other photographic and video exhibits offered by the state.

Rule 403 of the Rhode Island Rules of Evidence provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant. "The admission or exclusion of evidence 'under Rule 403 is within the sound discretion of the trial justice.'" State v. Shelton, 990 A.2d 191, 202 (R.I. 2010) (quoting Blue Coast, Inc. v. Suarez Corp. Industries, 870 A.2d 997, 1007 (R.I. 2005)). However, this Court has repeatedly warned that "the discretion to exclude evidence under Rule 403 must be exercised sparingly." Shelton, 990 A.2d at 202 (quoting State v. Hak, 963 A.2d 921, 928 (R.I. 2009)). Accordingly, "[i]t is only evidence that is marginally relevant and enormously prejudicial that must be excluded." Hak, 963 A.2d at 928 (quoting State v. Patel, 949 A.2d 401, 412-13 (R.I. 2008)).

In determining that the video should not be excluded under Rule 403, the trial justice noted that there had been testimony that "something happened in the bathroom" and his colloquy suggests that the probative value of the video lies with the fact that this videotape included both visuals of the bathroom and the bedroom, where Camden's body was ultimately found. In addition, the trial justice stated that the videotape showed a different perspective from other photographs, thus providing additional probative value.

While we do not ignore the fact that a three-and-a-half-minute focus on a deceased eight-year-old girl in her bed is a disturbing sight, we cannot conclude that the video was offered "solely to inflame the passions of the jury[,]" as would be required to prevent its admission. See State v. O'Brien, 774 A.2d 89, 107 (R.I. 2001) (quoting State v. Carter, 744 A.2d 839, 847 (R.I.

2000)). The thrust of defendant's argument that this video was unfairly prejudicial is directed at the video's focus on Camden's body in her bed, stating that "[o]ne cannot look at this [video] of this little girl, obviously dead, without having their heart broken." However, this Court has recognized that "[b]y their very nature, crime-scene [portrayals] of murder victims may unsettle or even horrify the viewer, yet * * * because it is the state's burden to prove each element of a crime beyond a reasonable doubt, such photographs are unquestionably relevant to its need to do so." Id. (quoting Carter, 744 A.2d at 847). Thus, because of the inherently prejudicial nature of a murder, "[t]he test for determining the admissibility of photographs does not gauge their ghastliness, but instead asks whether they will 'inflame the jurors and therefore prejudice them beyond the ordinary prejudice that is always sustained by the introduction of relevant evidence intended to prove guilt.'" Carter, 744 A.2d at 847 (quoting State v. Ellis, 619 A.2d 418, 424 (R.I. 1993)). "'Indeed, only when such evidence is offered solely to inflame the passions of the jury should a photograph' or other visual images of a crime victim be excluded." O'Brien, 774 A.2d at 107 (quoting Carter, 744 A.2d at 847). For that reason, "[t]his Court has consistently held that 'when such evidence * * * is probative, the trial court's admission of explicit photographs is not an abuse of discretion and will not be disturbed on appeal.'" Carter, 744 A.2d at 847 (quoting Hughes v. State, 656 A.2d 971, 972 (R.I. 1995)).

In the case at bar, the video presented was probative, as it displayed the pathway of the struggle which presumably ensued between defendant and Camden. Specifically, the video illustrated the course from the bathroom, where the fighting allegedly started, to Camden's bedroom, where it ended. Additionally, the video allowed the jury to see imagery of the floor next to the bed where the final struggle allegedly occurred and the bed in which defendant ultimately placed Camden's body. Further, the video showed the placement of a stuffed elephant

close to Camden's body, presumably where Tim moved it when he found her the morning after her death. Thus, the video served to corroborate Tim's account that when he found Camden, she was tucked into her bed with her stuffed animal under her arm.

Nevertheless, defendant claims that there was other cumulative, less prejudicial evidence showing the layout of the Fry house, including a sixteen-minute video. However, at the time that the seven-minute video was admitted, this longer sixteen-minute video had not yet been shown to the jury. Thus, the cumulative effect of the other video could not have been taken into the trial justice's calculus in making his Rule 403 determination.[11] Further, this longer video focuses largely on other areas of the home and was recorded after the medical examiner removed Camden's body, evidence placards were placed around the bedroom, and police had seized other evidence from the bedroom. This Court has never required the state to prove its case in the least prejudicial way possible; to the contrary, we have steadfastly held that, because the state bears the burden to prove its case beyond a reasonable doubt, "the state has the right to establish the existence of those elements as it deems just." State v. Spratt, 742 A.2d 1194, 1198 (R.I. 1999) (quoting State v. Mora, 618 A.2d 1275, 1280 (R.I. 1993)). Accordingly, the subsequent admission of this longer—yet arguably less probative—video did not render the video at issue cumulative.

We perceive no abuse of discretion in the trial justice's decision to admit the video over the defendant's objection on Rule 403 grounds.

---

[11] The sixteen-minute video was subsequently admitted without objection.

# IV

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The materials associated with this case may be remanded to that court.


**Justice Flaherty, dissenting.** I most respectfully dissent from the majority's opinion in this case. I do so because I believe that (1) it was error to admit the seven and a half minute video into evidence; and (2) the trial justice erred when he did not provide the jury with an accident instruction.

## 1

## The Video

It was error to admit the seven and a half minute video prominently displaying the child victim's body because whatever probative value the video may have had, it was grossly disproportionate to its prejudicial impact and, therefore, it should have been excluded pursuant to Rule 403 of the Rhode Island Rules of Evidence. It is well settled that "Rule 403 cuts across the rules of evidence." State v. Gaspar, 982 A.2d 140, 148 (R.I. 2009). When deciding whether or not to admit evidence, a trial justice "must carefully weigh the possibility that this evidence will unfairly prejudice the accused." State v. Brown, 626 A.2d 228, 233 (R.I. 1993) (citing State v. Chartier, 619 A.2d 1119, 1123 (R.I. 1993)). It does not appear from the record that the trial justice articulated, either expressly or impliedly, the balancing test required by Rule 403. This is, in my opinion, in and of itself, error. And, in the context of this case, that error cannot be said to be harmless. See State v. Pona, 948 A.2d 941, 953 (R.I. 2008) (Superior Court erred when it did

not attempt to strike a balance between the necessity of admission and the danger of unfair prejudice).

It goes without saying that the mere fact that the video contains images that are difficult for any reasonable person to see is not a sufficient reason to exclude it from consideration by the factfinder. To be sure, disturbing, and even shocking visual or audio images are nothing new to our jurisprudence. After all, we have said on many occasions that a criminal defendant "is not entitled to a sanitized version of the * * * evidence." State v. Pona, 66 A.3d 454, 468 (R.I. 2013). Indeed, the impact that such disturbing or gruesome images may have on the finder of fact has been addressed on many occasions by this Court.

For example, in State v. Ellis, 619 A.2d 418, 424 (R.I. 1993), we upheld the admission of photographs of a victim's head that was "blown apart by a shotgun blast." Likewise, in State v. Brown, 88 A.3d 1101, 1118-21 (R.I. 2013), we upheld the admission of autopsy photographs where the murder victim's dissected brain was shown with hair protruding from the folded skin of his scalp. And, in State v. Patel, 949 A.2d 401, 412-14 (R.I. 2008), we upheld the trial justice's admission of a 9-1-1 recording that contained a young child's distraught voice as he sobbed after his father was murdered before his eyes. In the recording, the rest of the family's agonized cries could clearly be heard in the background. Id. at 413.

The state argued, and the majority apparently agrees, that the video was necessary to demonstrate the interior of the Fry home and the path that defendant and Camden took as they struggled between the bathroom and the victim's bedroom.

The seven minute video is disturbing by any measure. However, it is significant that the video begins with a one minute and twenty second view of the exterior of the home as well as the

- 30 -

family car and its license plate. The viewer then follows the videographer as he enters the front door of the residence, at which time a man, presumably the child's father, can clearly be heard sobbing. The footage consumes only ninety seconds inside the bathroom and then takes but a few seconds travelling from the bathroom into the child's bedroom. Almost the entirety of the remainder of the video, consuming over half the footage, consists of the videographer panning the body of the dead child from every conceivable vantage point, including close-ups of the young girl's mottled skin after the processes of rigor mortis and livor mortis have been completed. After a four and a half minute viewing of her room—three and a half of which intensely focuses on the dead child's body—the remaining few seconds leave the viewer with shots of the child's bedroom, toys, and bookcase.

With all due respect to the majority, I see a difference, not merely in degree, but also in kind with respect to the images allowed into evidence in this case. The nearly silent scenes of the eight-year-old's body as the camera moves up, down, and around her lifeless corpse are macabre, if not grotesque. Given the extremely limited probative value of the images, there can be no other purpose or result other than to evoke feelings of sympathy or disgust in the jury, to the extreme prejudice of defendant. See State v. O'Brien, 774 A.2d 89, 107 (R.I. 2001); State v. Carter, 744 A.2d 839, 847 (R.I. 2000).

In my opinion, this evidence had a feather's weight, if that, of probative value, considering the few seconds dedicated to the state's purported purpose of depicting the crime scene. It is clear to me that any minimal probative value that the video may have had was substantially outweighed by the prejudicial impact that it carried. Patel, 949 A.2d at 412-13 ("It is only evidence that is marginally relevant and enormously prejudicial that must be excluded."). Therefore, the images should not have been admitted into evidence and it was error to do so.

**2**

**The Accident Instruction**

It is also my view that, contrary to the majority's opinion, defendant was entitled to a specific instruction with respect to the defense of accident. I come to this conclusion because (1) the entire thrust of the defense was that Camden's death was a tragic accident and (2) that there was more than sufficient evidence to support the defense's theory in the record to justify such an instruction. Indeed, we have explicitly said that

> "where there is evidence in the record 'in support of any defense offered by an accused, which raises an issue of fact favorable' to the accused, he or she is entitled to an affirmative instruction which fully and fairly states the law applicable thereto; that principle applies regardless of how 'slight and tenuous the evidence may be * * *.'" Larngar v. Wall, 918 A.2d 850, 857 (R.I. 2007) (quoting State v. DiChristofaro, 848 A.2d 1127, 1129-30 (R.I. 2004)).

The trial justice declined to impart a specific accident instruction, instead relying on two somewhat tangential references to accident that were included in his charge to the jury. The majority embraces this conclusion, reasoning that the charge that was provided to the jury informed the panel that it could not find defendant guilty unless it determined that her actions were intentional and not the product of unintentional conduct.

I respectfully disagree. The word accident appears in the trial justice's charge only twice in an instruction that spans twenty-five minutes. In his charge, the trial justice did not discuss accident as a theory of defense, but rather employed the word to modify and limn the definition of intent. This passing reference was insufficient in light of defendant's theory of the case, which was that Camden's death had been occasioned by unintentional conduct that occurred

- 32 -

while defendant was attempting to restrain an unruly child. The defendant's requested instruction, brief as it may have been, was much more clearly focused on that theory of defense.

Interestingly, the instruction that was given to the jury here is exquisitely similar to that in State v. Drew, 919 A.2d 397 (R.I. 2007). In Drew, we upheld the trial justice's refusal to give a specific accident instruction because a passing reference to the word "accident" during the testimony at trial did not "trigger a trial justice's obligation to issue an accident instruction." Id. at 405. We upheld the trial justice's refusal to give a comprehensive accident instruction because the defendant admitted that accident was not a defense he pursued at trial and the defendant neither presented evidence of accident at trial nor argued it in his closing. In Drew, the trial justice instructed that

> "As to the word 'willfully,' you are instructed that <u>an act is done willfully if it is done voluntarily and intentionally and not by mistake or accident</u>. * * * You should consider all of the facts and circumstances in evidence that you think are relevant in determining whether the state has proved beyond a reasonable doubt that [defendant] acted with the required intent or state of mind." Id. at 404 (emphasis added.).

According to the Court in Drew, this "anemic reference" to accident was appropriate based on the paucity of evidence of accident presented at trial. Id. Here, the trial justice instructed the jury that

> "<u>An act is done willfully if it is done intentionally and voluntarily and not by mistake or some other reason</u>.
>
> "* * *
>
> "You may, however, infer a defendant's intent from all the surrounding circumstances. You may consider any statement or act done by the defendant, and all other facts and circumstances that are in evidence which may indicate the state of her mind. <u>An act is done intentionally and deliberately and purposefully and not because of mistake or accident or any other innocent reason</u>." (Emphasis added).

- 33 -

If the reference to accident in <u>Drew</u> is indeed, "anemic," I cannot fathom how the majority reasons that the almost identical instruction employed here could have adequately apprised the jury of defendant's accident defense. The majority attempts to differentiate this case from <u>Drew</u> by seeking solace in the fact that the trial justice made two passing references to the word accident instead of one. I cannot agree that that was sufficient.

Additionally, I take issue with the majority's conclusions that an accident instruction was not justified because there was only "minimal evidence" that would support the jury's conclusion that Camden's death was accidental and its assessment that there was a dearth of evidence of an accidental occurrence. Under our jurisprudence, minimal evidence is all that is required. <u>See</u> <u>Larngar</u>, 918 A.2d at 857. In my view, there was much more than minimal evidence on the record.

The theme of both the opening and closing statements of defense counsel was that Camden's death was accidental and that it occurred while the mother was attempting to restrain a resistant and flailing child. The defense offered but one witness, Dr. Elizabeth Laposata, the state's former medical examiner. Doctor Laposata testified that the cause of Camden's death was consistent with an accident because it may well have occurred while her mother was attempting to restrain her, and that the cause of death was asphyxia as a result of a combination of compression of the blood vessels on the side of the neck, compression of the torso, and obstruction of the mouth. Significantly, on cross-examination, the state's witnesses Timothy Fry and Barbara Kettle testified that the defendant related to each of them that she tried to control the thrashing and screaming child by sitting on her and covering her mouth, and that she had successfully employed that procedure during past instances of difficulty with Camden. Although it is not the defendant's burden to prove that Camden's death was an accident, the defendant

more than provided minimal evidence upon which a trier of fact could conclude that the death was not intentional beyond a reasonable doubt. For these reasons, it is my opinion that the defendant was entitled to a specific accident instruction.

For the above reasons, I respectfully dissent from the majority's opinion in this case, and I would grant the defendant a new trial.


**TITLE OF CASE:**        State v. Kimberly Fry.

**CASE NO:**        No. 2013-221-C.A.
                    (W1/10-413A)

**COURT:**        Supreme Court

**DATE OPINION FILED:**   February 1, 2016

**JUSTICES:**        Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**        Associate Justice Gilbert V. Indeglia

**SOURCE OF APPEAL:**   Washington County Superior Court

**JUDGE FROM LOWER COURT**:

                    Associate Justice William E. Carnes, Jr.

**ATTORNEYS ON APPEAL:**

                    For State:   Christopher R. Bush
                                   Department of Attorney General

                    For Defendant:  Kara J. Maguire
                                   Office of the Public Defender